The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader.  The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
June 24, 2021

## 2021COA85

**No. 17CA1328, *People v. Daley* — Evidence — Witnesses — Opinion as to Truthfulness**

A division of the court of appeals holds that the trial court erred by allowing the prosecutor to ask a police detective whether the victim's in-court testimony was consistent with her out-of-court statements.  The division concludes, however, that this error was harmless.  Because it rejects the defendant's other claims of error, the division affirms the judgment of conviction.

COLORADO COURT OF APPEALS **2021COA85**

Court of Appeals No. 17CA1328
Boulder County District Court No. 15CR1974
Honorable Maria E. Berkenkotter, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Carri Lyn Daley,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE BERGER
Richman and Welling, JJ., concur

Announced June 24, 2021

Philip J. Weiser, Attorney General, Trina K. Taylor, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Anne T. Amicarella, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Carri Lyn Daley, appeals her convictions for one count of sexual assault on a child by one in a position of trust and as part of a pattern of sexual abuse, four counts of aggravated incest, one count of internet sexual exploitation of a child, four counts of sexual exploitation of a child, and one count of contributing to the delinquency of a minor.

¶ 2    One of the many issues raised by Daley is whether it was permissible for a police detective to testify that the victim's testimony was consistent with her out-of-court statements.  We hold in Part II.D.1, *infra*, that the court erred by allowing this testimony because it constituted an opinion on the truthfulness of the victim.  We conclude, however, that this error was harmless.  Because we reject Daley's other claims of error, we affirm her convictions.

I.    Relevant Facts and Procedural History

¶ 3    At trial, the prosecution presented evidence from which the jury could find the following facts.

A.    Abuse Relating to Communication With "the British Guy"

¶ 4    When the victim was fourteen years old, Daley (the victim's mother) began exchanging online messages with a man she called

"the British Guy." He messaged Daley that he had the sexual fantasy of having a threesome with a mother and daughter and that he would travel to Colorado to meet them.

¶ 5 The victim testified that Daley sent sexually explicit photos of the victim to the British Guy. The photos included Daley and the victim kissing, touching each other's breasts, and using vibrators on each other's genitals.

¶ 6 Daley and the victim discussed whether the victim should lose her virginity to the British Guy. The victim told Daley that she wanted to have sex with someone else first. With Daley's help, the victim met a twenty-one-year-old man online who agreed to have sex with her. The victim testified that she had sex with the man and discussed it with Daley. Ultimately, the British Guy never came to Colorado.

## B. Abuse Relating to "Daddy"

¶ 7 The victim testified that Daley kissed her, touched her breasts, and touched her vagina after Daley had "phone sex" with someone Daley had met online. The victim testified that Daley referred to this person as "Daddy."

## C.  Abuse Relating to Nick Helton

¶ 8  Daley traveled to California to visit a man she had met online. Daley texted the victim about her sexual encounters and bought the victim a vibrator.  On this trip, Daley also met Nick Helton.  Daley texted the victim about having sex with Helton.

¶ 9  Daley continued communicating with Helton on an instant messaging application when she returned to Colorado.  Daley, Helton, and the victim also communicated in a group chat on the same application.  Daley and the victim sent messages back and forth, which Helton could see, about having group sex with Helton. In a private message to Helton, Daley said, "[s]o have we teased you enough that you're just ready to throw [u]s down and fuck us both?"

¶ 10  Helton flew to Colorado.  While there, he had group sex with Daley and the victim, who was seventeen years old at the time.  The victim testified that she tried to leave when the other two removed their clothes, but Helton told her she had to stay.  The victim testified that she touched Daley's breasts, Daley "tried" to touch the victim's breasts, and Helton had sex with the victim.

¶ 11    The next day, Helton returned to California.  He and Daley messaged regarding their concern of how the victim was doing.

### D.    The Victim's Outcry

¶ 12    Daley and Helton continued their relationship over the next few months.  At some point, Daley again traveled to California to see him.

¶ 13    While Daley was gone, the victim told two friends about some of the abuse.  The friends were shocked, which confused the victim, who testified that she thought Daley's sexual behavior was normal.  The victim told the mother of one of the friends, who took her to the police.

¶ 14    A social worker called Daley as she was preparing to fly back from California and told her that the victim had been taken into custody for her safety.  Daley told Helton, and the pair exchanged concerned text messages.  Helton suggested that Daley call a neighbor to see if she could learn anything.  Daley responded, "[s]ooooooo not a good idea honey until I find out if this has anything to do with you!!!"  Helton replied, "I'm beyond super fucked if it does."  The police arrested Daley when she landed in

Colorado. Helton sent several messages "freaking out" about why Daley stopped responding.

### E. Charges and Convictions

¶ 15     The prosecution charged Daley with thirteen counts: sexual assault on a child by one in a position of trust, including a pattern of sexual abuse, § 18-3-405.3(1), (2), C.R.S. 2020; six counts of aggravated incest, § 18-6-302(1)(a), C.R.S. 2020; internet sexual exploitation of a child, § 18-3-405.4(1), C.R.S. 2020; four counts of sexual exploitation of a child, § 18-6-403, C.R.S. 2020; and contributing to the delinquency of a minor, § 18-6-701, C.R.S. 2020.

¶ 16     The jury found Daley guilty as charged, except that it acquitted her of the two counts of aggravated incest pertaining to the incident with "Daddy." While the jury found that Daley committed a pattern of sexual abuse against the victim, consistent with its not-guilty verdict on the "Daddy" counts, the jury did not find that Daley "committed sexual contact, or penetration, or intrusion of victim relating to 'Daddy'" as part of that pattern.

### II. Analysis

¶ 17     Daley contends on appeal that the trial court

- violated her right to be present at trial;

- violated her right to an impartial and competent jury;

- erred by refusing to instruct the jury on the reliability of child hearsay;

- erred by allowing the prosecutor to ask a police detective whether the victim's testimony at trial was consistent with her prior statements;

- erred by admitting an unavailable witness's statements against interest;

- erred by admitting res gestae evidence about the sexual environment in which Daley raised the victim;

- erred by excluding testimony under the rape shield statute; and

- violated her right to a fair trial through cumulative error.

We address each argument in turn.

## A. Right to be Present at Trial

¶ 18 Daley argues that the trial court violated her constitutional right to be present by proceeding with trial after she was hospitalized for an apparent suicide attempt. This argument is preserved.

6

¶ 19    This argument has two sub-issues: first, whether Daley waived her right to be present by her mid-trial voluntary absence; and second, if there was waiver, whether the court abused its discretion by proceeding with trial in her absence.

### 1.    Additional Background

¶ 20    Daley was not in custody when the trial began.  She attended the first four days of trial.  On the fifth morning of trial, a Monday, counsel for the parties learned that Daley had been hospitalized for a drug overdose.

¶ 21    First responders discovered three pill bottles on Daley's nightstand, along with an empty beer bottle and a glass that contained residue of crushed pills.  One pill bottle was for hydrocodone (an artificial opiate) prescribed to Daley, another for hydrocodone prescribed to the victim, and a third for tramadol (another artificial opiate) prescribed to a dog.  There was also a note on the nightstand that said, "[the victim] was right.  This world doesn't need another me."

¶ 22    Daley was taken to a hospital.  She was largely unresponsive to both nasal and intravenous Narcan, a drug typically administered to prevent or mitigate an opioid overdose.  Doctors put

7

Daley on a Narcan drip, but she continued to fade in and out of consciousness. Doctors thought that she may need to be taken to the Intensive Care Unit. (She was eventually taken there that afternoon.) At the time, the parties understood that Daley would not be medically cleared and available for a mental health evaluation until late Tuesday or Wednesday, after which a psychiatrist would determine whether a further mental health hold was necessary.

¶ 23    The prosecution argued that the circumstances established that Daley was voluntarily absent from trial and that the trial should proceed. The court agreed, finding that "the defendant has made herself voluntarily absent by virtue of a mid-trial suicide attempt." The court then ruled that the trial would proceed without her.

¶ 24    When trial resumed, the court instructed the jury, "Ms. Daley is not here. You are not to draw any adverse inference from her absence." Daley was absent for the remainder of trial.

## 2. Law

¶ 25    A defendant has a constitutional right to attend her own trial. U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16; *People v. Janis*, 2018 CO 89, ¶ 16.

¶ 26    We review de novo the ultimate question "[w]hether a trial court violated a defendant's constitutional right to be present at trial." *Janis*, ¶ 14. Whether this right was relinquished by an effective waiver presents "a mixed question of fact and law." *People v. Price*, 240 P.3d 557, 560 (Colo. App. 2010). We review factual findings for clear error. *People v. Beauvais*, 2017 CO 34, ¶ 22; *United States v. Edwards*, 303 F.3d 606, 627 (5th Cir. 2002) (reviewing factual findings about whether the defendant was voluntarily absent for clear error).

¶ 27    A waiver of the right to be present at trial "is valid only when the record as a whole demonstrates that the waiver was knowing, intelligent, and voluntary." *Janis*, ¶ 26. The prosecution may satisfy its burden of proving waiver with "statements of counsel and circumstantial evidence." *Id.*

¶ 28    The preferred method of waiver is by colloquy with the defendant at a hearing, but "a defendant may waive his or her right

to be present by his or her actions, including voluntary absence, after the trial has been commenced in his or her presence." *Price*, 240 P.3d at 560 (citing Crim. P. 43(b)). "An absence is voluntary if the defendant knows that the proceedings are taking place and does not attend." *People v. Stephenson*, 165 P.3d 860, 869 (Colo. App. 2007) (citing *Crosby v. United States*, 506 U.S. 255 (1993)).

¶ 29 Further, "a defendant's absence may be deemed voluntary where the record establishes that he or she created the medical necessity in order to effect his or her absence from trial." *Price*, 240 P.3d at 560-61. Determining whether a defendant was voluntarily absent mid-trial "requires a fact-specific inquiry into the type of medical condition and circumstances surrounding his or her absence, including an inquiry into the defendant's conduct and statements." *Id.*

¶ 30 In *Price*, the defendant attempted suicide mid-trial by cutting his wrists and throat, requiring hospitalization. *Id.* at 561. The defendant left a note that said, "I cannot live with the crap trial that I am going through in Douglas County. It's all lies and coached by the D.A.'s office." *Id.* In holding that the defendant was voluntarily absent, a division of this court reasoned that he "was aware his trial

10

was taking place by attending the first day. His suicide note . . . reflected both that he understood the proceedings against him and that he purposefully determined to absent himself from the trial." *Id.*

¶ 31     Even after a defendant waives her right to be present, the court has discretion to proceed with the trial or delay it. *People v. Trefethen*, 751 P.2d 657, 658 (Colo. App. 1987); *see also* Crim. P. 43(b) ("The trial court in its discretion may complete the trial . . . ."). We therefore review the court's decision to proceed with trial for an abuse of discretion. *Trefethen*, 751 P.2d at 658. A court abuses its discretion if its ruling is "manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law." *AA Wholesale Storage, LLC v. Swinyard*, 2021 COA 46, ¶ 32. Judicial discretion "means that the court is not bound to decide the issue one way or another, but has the power to choose between two or more courses of action and is not bound in all cases to choose one over the other." *Gibbons v. People*, 2014 CO 67, ¶ 42.

### 3.     Application

¶ 32     Like the defendant in *Price*, Daley voluntarily absented herself from trial when she attempted suicide. *See* 240 P.3d at 560-61.

11

Daley attended the first four days of trial, so she was clearly aware that it was taking place. *Id.* Her note, the pills, and the accompanying medical emergency demonstrated that she intended to absent herself from trial.

¶ 33     Daley argues that the prosecution did not clearly establish that she attempted suicide, but the record amply supports the trial court's finding that she did. Daley ingested narcotics from three separate bottles, two of which were not prescribed to her, and one of which was for a dog. This, combined with Daley's note, supports the trial court's finding and was a sufficient basis for rejecting Daley's counsel's assertion that she may have only accidentally overdosed while taking the pills to fall asleep. For the same reasons, we reject Daley's attempt to distinguish *Price* on the ground that the defendant's conduct in that case was more clearly a suicide attempt.

¶ 34     Daley also argues that self-inflicted medical absences are not "per se" voluntary absences. We agree that determining whether a defendant was voluntarily absent depends on "a fact-specific inquiry into the circumstances surrounding the absence." *Id.* at

12

561. Here, as discussed, the circumstances of Daley's absence demonstrate that it was voluntary.

¶ 35    Next, Daley argues that there was no evidence that her voluntary absence was intended "to frustrate the progress of the trial." But that is not the relevant inquiry. Rather, a court must find that "she created the medical necessity in order to effect . . . her absence from trial." *Id.* at 560-61. As discussed, the trial court found, with record support, that Daley created a medical necessity to be absent from trial.

¶ 36    Having concluded that Daley waived her right to be present, we turn to whether the court abused its discretion by allowing the trial to continue.

¶ 37    Daley argues that the court erred by not meaningfully distinguishing between its voluntariness determination and its decision to proceed with trial. The record belies this argument. The court gave the lawyers time to determine why Daley was absent. The court listened to their information, read case law, and determined that Daley was voluntarily absent. Then, the court determined that the trial should proceed in her absence.

¶ 38    Daley also argues that the court erred by not employing a balancing test used by federal courts. *See United States v. Latham*, 874 F.2d 852, 859-60 (1st Cir. 1989). Specifically, Daley argues that the court should have weighed the public interest of proceeding with trial against her interest in attending the trial. No Colorado court has held that this federal balancing test is required. But even if it is required, the trial court sufficiently considered the relevant factors.

¶ 39    The court recognized that Daley was not responding to Narcan, and that she was not expected to be released from the hospital for at least two days, if not longer.[1] The court referred to its concerns about the tight trial schedule that it had articulated days before Daley's absence. Additionally, the court heard both parties' understandings of Daley's condition and the events that led to her hospitalization. The court knew that Daley had been present during the first four days of trial and that she had been actively participating by passing notes to her lawyer.

---

[1] Ultimately, Daley was released from the hospital four days later, the day the jury returned its verdict. The record does not reveal whether she was fit to return to the courtroom even then.

¶ 40　　The court's careful consideration of and allotment of time to this issue convinces us that even if the court did not explicitly consider every factor articulated in the federal balancing test, assuming it was required to do so, it impliedly considered each factor. *See People v. McIntyre*, 789 P.2d 1108, 1110-11 (Colo. 1990) (upholding trial court's ruling based on its implied findings).

¶ 41　　For all these reasons, the court did not violate Daley's constitutional right to be present at trial.

### B.　Allegedly Sleeping Jurors

¶ 42　　After the verdicts were returned by the jury, Daley moved for a new trial on the basis that "multiple jurors were witnessed sleeping" during trial. Daley contends that the trial court erred by denying her motion.

¶ 43　　The parties agree that we review a trial court's ruling on a motion for a new trial for an abuse of discretion. *Rains v. Barber*, 2018 CO 61, ¶ 8.

### 1.　Additional Background

¶ 44　　During trial, the court and counsel for both parties repeatedly addressed concerns about three members of the jury who appeared to be drowsy or possibly asleep. Unless otherwise specified, the

15

following facts derive from conversations between the parties and the court at multiple bench conferences.

¶ 45      Juror H was one juror about whom the parties and the court expressed concern. The court noticed that Juror H looked tired during the trial. Later, the court on its own motion questioned Juror H outside the presence of the other jurors. The juror stated that she had not fallen asleep. She said, "My contacts are killing me today, so I just kind of listen and open [my eyes] when I see something new . . . . I've been putting drops in." Defense counsel moved to replace Juror H with an alternate. Based on the juror's comments, the court denied the motion.

¶ 46      Another potentially problematic juror was Juror D. The court noticed that Juror D listened to parts of opening statements with his eyes closed. Later during the trial, the court again noted that Juror D would listen with his eyes closed, often during difficult testimony. The prosecutor stated that Juror D often held his head down because he was taking notes in his lap. No one alleged, nor did the court find, that Juror D ever fell asleep.

¶ 47      Juror M was the third juror whom the court and the parties discussed. Defense counsel told the court that Juror M had fallen

asleep during opening statements. The court disagreed. The court stated that it was "discretely [sic] watch[ing] what's happening in the jury box" and that "[i]t wasn't my perception that anybody fell asleep." Later, the prosecutor stated that although she had not seen him sleeping, she "felt like [she] heard him . . . potentially snoring." The prosecutor went on to say that, "in all fairness, he's a very loud breather as well, so it's hard to tell which one it is." The court stated that the juror displayed visible signs of listening and being awake even when his eyes were closed. The court also noted that defense counsel had not observed "anything that was unconstitutional or other dimension in terms of what may be happening with" Juror M. Later that day, the prosecutor and the court reiterated their impressions that Juror M was not snoring, but that he was just a heavy breather ("It's like a snort almost," said the prosecutor).

¶ 48     The parties and the court continued to keep a watchful eye on Juror M. At some point, defense counsel stated that he had again seen Juror M "do[z]ing in and out of sleep," so the court questioned Juror M outside the presence of the other jurors. He said that sitting down all day was difficult for him, but he was "do[ing] stuff

17

to keep [himself] awake," and that he had heard the evidence presented. The court noted that Juror M would lean back and forth, tap his feet, and take his shoes on and off during the instances when he closed his eyes. The court reasoned that those activities indicated that Juror M was staying awake. Defense counsel did not move to replace Juror M.

¶ 49 The court took many proactive steps to prevent jurors from falling asleep. Frequently, the court had the bailiff bring the jurors coffee and tea. The court gave multiple stretch breaks for the jury each day; whenever counsel requested a break, it was granted. The court advised the jurors that if they listened with their eyes closed, they needed to take notes or do something to demonstrate that they were awake. And the court took notes on jurors who had their eyes closed, observing and recording signs that the jurors were still awake.

¶ 50 A few weeks after trial, both alternate jurors emailed the court to express their concerns about jurors sleeping through trial. Defense counsel filed a motion for a new trial based on the emails.

¶ 51 The court denied the motion, citing the extensive record that the court, the prosecutor, and defense counsel had made

throughout trial. While they were all aware of and attuned to the possibility of sleeping jurors from the first day of trial, the court found that no jurors actually fell asleep.

### 2. Preservation and Jurisdiction

¶ 52 We must first address the Attorney General's argument that the trial court lacked jurisdiction to rule on Daley's motion because it was untimely. Daley moved for a new trial twenty-four days after the verdicts, and four days after receipt of the second alternate juror's email.

¶ 53 "A motion for a new trial based upon newly discovered evidence shall be filed as soon after entry of judgment as the facts supporting it become known to the defendant . . . ." Crim. P. 33(c). "A motion for a new trial other than on the ground of newly discovered evidence shall be filed within 14 days after verdict or finding of guilt or within such additional time as the court may fix during the 14-day period." *Id.*

¶ 54 Without explanation, the Attorney General asserts that the alternate jurors' emails did not constitute new evidence under the rule. Therefore, the Attorney General argues that the fourteen-day

period applies, and that Daley's failure to file in that period required the court to deny the motion for lack of jurisdiction.

¶ 55     To support that argument, the Attorney General cites *People ex rel. Iuppa v. District Court*, 731 P.2d 723 (Colo. 1987).  That case is inapplicable.  In *Iuppa*, the supreme court held that failure to file a Crim. P. 33 motion within a time period prescribed by the trial court is a jurisdictional bar when the court *orders* the defendant to file such a motion.  *Id.* at 724.  That did not happen here.

¶ 56     Instead, we apply the principle that in criminal cases, a "timely motion for a new trial is not jurisdictional in the sense that without it the court would lack authority to adjudicate the subject matter."  *People v. Moore*, 193 Colo. 81, 83, 562 P.2d 749, 751 (1977); *see also People v. Clark*, 2015 COA 44, ¶ 188 (distinguishing *Iuppa* and recognizing that "the filing requirements of Crim. P. 33 were tempered by Crim. P. 45").

¶ 57    We conclude the trial court had jurisdiction to adjudicate

Daley's motion.  We have appellate jurisdiction to review the trial

court's order on the merits.[2]

### 3.    Law

¶ 58    "Jury misconduct that materially affects the substantial rights

of a party so as to prevent a fair and impartial trial may serve as

grounds for a new trial."  *People v. King*, 121 P.3d 234, 241 (Colo.

App. 2005).  A juror sleeping during trial may constitute juror

misconduct that materially affects the defendant's rights.  *People v.*

*Evans*, 710 P.2d 1167, 1168 (Colo. App. 1985).

¶ 59    In *Hanes v. People*, the supreme court addressed a trial court's

denial of a motion to dismiss a juror who was allegedly sleeping.

198 Colo. 31, 34, 598 P.2d 131, 133 (1979).  The supreme court

reasoned that the trial court was aware of the possibility that the

juror was sleeping and had watched the juror from "an advantaged

position" on the bench "to determine whether that possibility was

true."  *Id.*  The trial court questioned the juror and found that he

---

[2] Because we conclude that the trial court did not err by denying
the motion on the merits, we need not and do not address any of
the other preservation issues raised by the Attorney General.

was attentive.  *Id.*  The supreme court held that the trial court did not abuse its discretion by relying on its own observations in denying the motion to dismiss.  *Id.*

### 4.    Application

¶ 60    The record supports the trial court's finding that no jurors slept during trial.  The court's observations throughout trial, as well the observations stated in its order, demonstrate that the court was carefully monitoring the jury.  When the court was concerned whether a particular juror had fallen asleep (Juror H, Juror M), it questioned the juror on the record.

¶ 61    The court and the parties made detailed records of juror attentiveness, including Juror H's habit of closing her eyes but still taking notes, Juror M's habit of tapping his feet and taking his shoes on and off, and Juror D's habit of closing his eyes and grimacing during difficult testimony.  Additionally, the record supports the trial court's finding that Juror M was not snoring but merely breathing heavily.

¶ 62    Given this extensive record, the court acted within its discretion by relying on its own observations, instead of the observations of the two alternate jurors.  Like the supreme court in

*Hanes*, we defer to the trial court's observations because it had a clearer vantage point than the alternates from which to view the jurors in question. 198 Colo. at 34, 598 P.2d at 133. The court could look directly at the jurors' faces and observe their body language from the front; the alternate jurors sat in the back row and could not see their peers' faces.

¶ 63 This case is nothing like *People v. Evans*, on which Daley relies. There, the trial court knew that a juror was sleeping during closing argument but did nothing about it. 710 P.2d at 1168. A division of this court reversed because the trial court did not replace the juror with an alternate, admonish the juror, or call for a recess. But here, as discussed, the court consistently and diligently took action.

¶ 64 Daley argues that the court erred by only discussing two jurors in its order (Jurors M and H). Not so. Daley's motion alleged that jurors were sleeping but did not specify which jurors. No one alleged that Juror D, or any other specific jurors, had fallen asleep. That being the case, the court acted within its discretion by addressing only those jurors whom defense counsel had alleged were sleeping during trial: Jurors M and H.

¶ 65    Daley argues that the alternate jurors' emails, on which her motion was based, discuss more than two sleeping jurors. This is false. The first alternate's email referenced "at least two jurors," and later in the email, "two jurors." The second alternate's email referenced only "one juror."

¶ 66    Undeterred, Daley argues that the court's order only addressed sleeping jurors, but that it did not address drowsy or otherwise inattentive jurors. This is because the basis for Daley's motion for a new trial was that "multiple jurors were *witnessed sleeping*." (Emphasis added.) No other basis for a new trial was presented to the trial court. Other bases therefore are not preserved for our review. *See* Crim. P. 33(c) (motion for new trial must allege with particularity the alleged defects and errors).

¶ 67    In any event, we conclude that the allegation of inattentive or drowsy jurors in this case does not rise to the level of constitutional juror misconduct. Everyone gets drowsy from time to time, and the trial court took many remedial steps to address that reality in this case, such as bringing the jurors coffee and tea and allowing for breaks.

## C.  Refusal to Give the Child Hearsay Instruction

¶ 68    Daley argues that the trial court erred by refusing to instruct the jury on the unreliability of child hearsay under section 13-25-129, C.R.S. 2017.[3]  We reject this argument.

### 1.  Child Hearsay Statute

¶ 69    Section 13-25-129(1) states that

> [a]n out-of-court statement made by a child . . . *not otherwise admissible by a statute or court rule which provides an exception to the objection of hearsay*, is admissible in evidence in any criminal, delinquency, or civil proceedings in which a child is a victim of an unlawful sexual offense.

(Emphasis added.)  "If a statement is admitted pursuant to this section, the court shall" give a specific child hearsay instruction. § 13-25-129(2).

### 2.  Additional Background

¶ 70    Before trial, the prosecution filed a "Notice of Intent to Admit Child Hearsay Evidence," which stated the prosecution's "intent to

---

[3] The child hearsay statute was amended in 2019.  Though the current and pre-amendment statutes, for the purposes of our inquiry, are not materially different, we refer to the statute in effect at the time of Daley's trial for clarity and accuracy.  *See* Ch. 42, sec. 1, § 13-25-129, 2019 Colo. Sess. Laws (S.B. 19-071 amended the statute).

admit all of the disclosures by [the victim] regarding and describing the sexual and physical acts which are the subject of this action." The notice stated further that the prosecution "in no way forfeit[ed] or limit[ed] other avenues for the introduction of hearsay statements."

¶ 71 At a pretrial hearing, Daley stipulated "to the time[,] content[,] and circumstances [of the victim's hearsay statements] as being reliable under the child hearsay statute." But she "reserv[ed] the right to object on relevancy grounds or other evidentiary grounds."

¶ 72 At trial, Daley's counsel extensively attempted to impeach the victim through cross-examination about prior inconsistent statements. In response, numerous prosecution witnesses testified as to what the victim had told them. Daley identifies eight such witnesses. Most of the testimony from these witnesses was given without objection, with two exceptions.

¶ 73 First, Daley objected to one prosecution witness's testimony about what the victim had told her regarding a friend's response to the victim's outcry. In response, the prosecutor argued, among other things, that the testimony about what the victim said constituted "prior consistent statements" that were admissible

26

"based on cross-examination from defense counsel." The court overruled Daley's objection. Second, Daley objected to the prosecutor's question to a detective about the consistency of the victim's statements. The court again allowed the testimony as prior consistent statements.

¶ 74    At the jury instruction conference, Daley asked the court to give the statutory child hearsay instruction. The prosecutor stated, "[T]he purpose of this instruction is if you were admitting statements under the child hearsay [statute] and we have not done that in this case." The court agreed and refused the instruction.

3.    No Evidence Was Admitted Under the Child Hearsay Statute

¶ 75    The court never ruled that any witness's testimony was admitted under the statute. In fact, there were no discussions about admitting evidence under the statute at trial until the jury instruction conference.

¶ 76    Daley claims that she was misled into believing that the victim's prior statements were admitted under the statute due to the prosecution's notice. Given this, she argues that she had no reason to object to the testimony. This argument ignores the fact that the prosecution explicitly stated in its notice that it "in no way

27

forfeit[ed] or limit[ed] other avenues for the introduction of hearsay statements." In response to the notice, Daley stated that she reserved the right to object on "other evidentiary grounds." Clearly, both parties expressly contemplated that this evidence could be admitted and objected to on other grounds.

¶ 77 More importantly, the child hearsay statute by its own terms only applies to evidence "not otherwise admissible by a statute or court rule which provides an exception to the objection of hearsay." § 13-25-129(1), C.R.S. 2017. Except as analyzed below, Daley has not asserted that the testimony was inadmissible as prior consistent statements.[4] The statute therefore did not apply to the witnesses' testimony about what the victim told them.

¶ 78 If Daley thought that the evidence was inadmissible on other evidentiary grounds, she was required to object on those specific grounds. *See Am. Fam. Mut. Ins. Co. v. DeWitt*, 216 P.3d 60, 66-67 (Colo. App. 2008) (relevance objection does not preserve a CRE 403 objection), *aff'd*, 218 P.3d 318 (Colo. 2009). If Daley was concerned about the basis on which hearsay testimony was being admitted,

---

[4] Daley challenges the detective's opinion regarding the consistency of the victim's statements, which we analyze next.

she should have clarified the matter on the record. Except for the two instances identified above, Daley did none of this.

¶ 79 When Daley did object, the court overruled her objection and admitted the testimony as prior consistent statements. She can hardly now claim surprise that other unobjected-to evidence could have been admitted for that purpose.

¶ 80 Because no testimony was admitted under the child hearsay statute, the court did not err by refusing Daley's tendered instruction.

### D.  Testimony About the Consistency of the Victim's Statements

#### 1.  The Court Erred

¶ 81 Next, Daley contends that the trial court erred by allowing the prosecutor to ask a detective a series of questions about whether the victim's in-court testimony was consistent with her out-of-court statements. Disagreeing with the analysis of another division of this court, we agree with Daley.

#### a.  Additional Facts

¶ 82 After Daley had extensively impeached the victim with prior inconsistent statements, the prosecution called a police detective who had observed the majority of the victim's post-outcry

interviews.  The prosecutor asked the detective, "Generally, when [the victim's] talking about the British [G]uy, for example, is her testimony in the Blue Sky Bridge Interview generally consistent with her testimony during this trial?"

¶ 83    Daley objected and argued at a bench conference that "[the prosecutor] just had him state an opinion as to her truthfulness by asking him if it was consistent.  I ask that that question or his response as it was made be stricken.  It's not permissible.  That's a question for the jury to decide."  Daley argued further, "[W]e had six days of trial testimony here where everyone had an opportunity to talk about what was said and what wasn't said, and it's not proper to then allow this man to summarize everything and say it was all consistent."  The court overruled the objection and allowed the following series of questions:

> [Prosecutor]: Detective . . . , so we are talking about the Blue Sky Bridge interview back in November of 2015.  When [the victim] is speaking in the Blue Sky Bridge interview is what she describing [sic], for example, when she's talking about the British [G]uy and generally -- was that generally consistent with the testimony that she gave during this trial?
>
> [Detective]: Yes.

[Prosecutor]: When she's talking about her mother taking photos and videos of her, penetrating her vagina, fondling her breasts and kissing her, sending those pictures and videos to the British [G]uy, is that all generally consistent with what she had described?

[Detective]: Yes.

[Prosecutor]: When she described this time period after the British [G]uy where her mom would touch her breasts or grab her butt or she would do the same to her mom, was that generally consistent with what she described in the Blue Sky Bridge interview?

[Detective]: Yes.

[Prosecutor]: Same goes for the incident that she described, the Daddy incident where her mom is masturbating on the phone with him and rolls over and then they begin mutually touching each other, penetrating the vagina, kissing, fondling breasts, things like that, is that generally consistent?

[Detective]: Yes.

[Prosecutor]: When she described the incident where Nick [Helton] comes to town and a threesome occurs and the sequence of events that she described, is that all generally consistent with how she described it in the Blue Sky Bridge interview?

[Detective]: Yes.

¶ 84    The jury never heard the victim's prior statements in the interviews, only the detective's opinion that those statements were consistent with her trial testimony.

### b.    Law and Application

¶ 85    The Attorney General argues that the trial court did not err because it merely allowed the prosecution to admit the victim's prior consistent statements. But that is not what the prosecution did. It presented a police detective's *opinion* that the victim's prior statements *were consistent* with her trial testimony. This is materially different than admitting the statements themselves and is problematic for at least two reasons.

¶ 86    First, the detective's statement on the victim's consistency was nothing less than an opinion on the victim's truthfulness in her account of the material events. This was improper because "neither lay nor expert witnesses may give opinion testimony that another witness was telling the truth on a specific occasion." *People v. Wittrein*, 221 P.3d 1076, 1081 (Colo. 2009). This prohibition includes indirect opinions on another witness's credibility or

truthfulness.[5] *Venalonzo v. People*, 2017 CO 9, ¶ 32. The Attorney General has not explained, and we cannot discern, any other probative purpose for the detective's opinions. Out-of-state cases addressing similar fact patterns support our conclusion. *See People v. Bobian*, 2019 COA 183, ¶¶ 45-49 (Berger, J., specially concurring) (collecting cases).

¶ 87    For example, the Kentucky Supreme Court has reasoned that "testimony that the witness previously made statements that were consistent with her trial testimony" was improper because "the evidence is offered to prove that the declarant's trial testimony is truthful." *Dickerson v. Commonwealth*, 174 S.W.3d 451, 472 (Ky. 2005).

¶ 88    Similarly, the South Carolina Supreme Court held that it was error to introduce a forensic interviewer's written reports in which the interviewer stated that the children "provided details consistent with the background information received from mother, the police

---

[5] This prohibition extends, for example, to comments on a witness's sincerity, believability, or predisposition to fabricate allegations. *People v. Eppens*, 979 P.2d 14, 17 (Colo. 1999) (sincerity); *People v. Gaffney*, 769 P.2d 1081, 1088 (Colo. 1989) (believability); *People v. Snook*, 745 P.2d 647, 649 (Colo. 1987) (predisposition to fabricate).

report, and the other two children." *State v. Jennings*, 716 S.E.2d 91, 94 (S.C. 2011). The South Carolina Supreme Court concluded that "[t]here is no other way to interpret the language used in the reports other than to mean the forensic interviewer believed the children were being truthful." *Id.*

¶ 89 We recognize that a division of this court has held differently, but we disagree with its analysis. *See Chavez v. Chavez*, 2020 COA 70, ¶ 13 (we are not bound by prior divisions). In *People v. West*, a detective testified that the timing of text messages between the victim and the defendant was consistent with the victim's testimony. 2019 COA 131, ¶ 37. In distinguishing this testimony from improper bolstering, the division reasoned that "the detective said nothing about the truth of [the] testimony; instead, the detective indicated only that certain statements did not conflict with other statements or evidence." *Id.* at ¶ 43.

¶ 90 We do not apply *West*'s reasoning because it is at odds with Colorado Supreme Court precedent. The supreme court has held that witnesses may not directly or *indirectly* testify about the truthfulness of another witness. *See Wittrein*, 221 P.3d at 1081. But that is what happened here.

¶ 91    The second reason the detective's opinion was improper is that it usurped the jury's function.  It is the jury's fundamental task to consider all testimony and to determine which version of the events is more credible.  *Bobian*, ¶ 39 (Berger, J., specially concurring).  Similarly, it was for the jury to determine whether the victim's statements were consistent with what she said before trial.  The usurpation was particularly harmful in this case because the jury did not hear any of the recorded interviews.  Instead, the jury only heard the detective's opinion that the victim testified consistently with those interviews.  The jury had no way to independently evaluate the detective's opinion.

¶ 92    We also resoundingly reject the Attorney General's argument that time constraints necessitated and permitted the detective's testimony because it would have taken too long to admit fifteen hours of the victim's recorded interviews.  Time constraints do not allow the prosecution to run roughshod over a criminal defendant's right to a fair trial.  Time constraints are no excuse for failing to comply with evidentiary rules.

¶ 93    Additionally, the prosecution need not have introduced all fifteen hours of interviews.  It only needed to introduce those prior

35

consistent statements necessary for rehabilitation. It is common practice to isolate important pieces of audio or visual recordings from the recording as a whole, separating the wheat from the chaff.

¶ 94 We therefore hold that the trial court abused its discretion by admitting this testimony.

## 2. The Error Was Harmless

¶ 95 The standard of reversal for preserved evidentiary claims is harmless error. *Hagos v. People*, 2012 CO 63, ¶ 12. An error is harmless if there is no reasonable possibility that it contributed to the conviction. *Pernell v. People*, 2018 CO 13, ¶ 22. Under this standard, we will not reverse unless the error "substantially influenced the verdict or affected the fairness of the trial proceedings." *Hagos*, ¶ 12 (citation omitted).

¶ 96 For three reasons, we conclude that there is no reasonable possibility that the error contributed to Daley's convictions.

¶ 97 First, the jury's split verdict is strong evidence that it was not influenced by the detective's improper testimony. One of the improper exchanges concerned the alleged abuse relating to "Daddy." The prosecutor asked about "the Daddy incident where her mom is masturbating on the phone with him and rolls over and

then they begin mutually touching each other, penetrating the vagina, kissing, fondling breasts, things like that, is that generally consistent?" The detective said yes. Despite this improper bolstering, the jury acquitted Daley of all charges pertaining to the "Daddy" incident. This demonstrates that the jury was not substantially influenced by the testimony.

¶ 98    Second, the detective's improper bolstering was miniscule in comparison to the proper corroboration accomplished by other witnesses. The detective's testimony covered about a page and a half of transcript during an eight-day trial. The fact that improperly admitted testimony was brief and fleeting supports a conclusion that it was harmless. *People v. Herdman*, 2012 COA 89, ¶¶ 46-47. More importantly, as discussed in Part II.C, *supra*, the jury heard a great deal of testimony from other prosecution witnesses about the victim's prior consistent statements. Daley identified eight witnesses who gave such testimony. The magnitude and variety of testimony properly corroborating the victim's testimony leads us to conclude that the detective's fleeting opinion did not affect the jury.

¶ 99    Third, the evidence against Daley was overwhelming. *See Bartley v. People*, 817 P.2d 1029, 1034 (Colo. 1991) (an error may

be harmless if there was overwhelming evidence of guilt). In a series of text messages that were presented to the jury, Daley acknowledged the existence of "naked" photos of the victim that they took for the British Guy. As to the convictions regarding the events involving Helton, the jury saw messages between Helton and Daley that alluded to a plan to have group sex with the victim and later corroborated that it occurred. The evidence also included Helton's statements against interest (discussed in the next section), acknowledging that the group sex occurred and that he had sex with the victim.

¶ 100   The victim was able to identify a photo of Daley's genitals, including a mole. This identification was evidence that Daley had the victim touch Daley's genitals. And the victim's testimony, given over multiple days, alleged with detail the sexually explicit photos that Daley took of her and sent to others, as well as Daley's specific acts of sexual abuse.

¶ 101   Daley counters by pointing our attention to the alternate jurors' emails, both indicating that they would not have returned a guilty verdict. These statements are not competent evidence under CRE 606(b), and Daley does not claim that they are. *See Clark,*

¶ 239 (discussing competent evidence). Therefore, we do not further address these statements.

¶ 102 For all these reasons, we conclude that the court's error was harmless.

## E. Other Evidentiary Rulings

¶ 103 Daley argues that three other evidentiary rulings constituted reversible error.

### 1. Standard of Review

¶ 104 "We review a trial court's evidentiary rulings for an abuse of discretion." *Campbell v. People*, 2019 CO 66, ¶ 21. For a preserved error, we reverse only if it substantially influenced the verdict or affected the fairness of the trial proceedings. *People v. Garrison*, 2017 COA 107, ¶ 31.

### 2. Unavailable Witness's Statements Against Interest

¶ 105 The trial court admitted two of Helton's out-of-court statements as statements against interest. CRE 804(b)(3). Such statements "are not excluded by the hearsay rule if the declarant is unavailable as a witness." CRE 804(b). Helton died in California while awaiting extradition to Colorado. It is uncontested that his death rendered him unavailable under the rule. *See* CRE 804(a)(4).

39

¶ 106    A statement is against interest if two elements are met:

> (A) a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it . . . had so great a tendency to . . . expose the declarant to civil or criminal liability; and
>
> (B) [the statement] is supported by corroborating circumstances that clearly indicate its trustworthiness . . . .

CRE 804(b)(3).

¶ 107    A statement tends to subject a person to criminal liability if the statement "would have been probative in a trial against him." *People v. Moore*, 693 P.2d 388, 390 (Colo. App. 1984).

### a.    Helton's Statements on the Bridge

¶ 108    A police officer discovered a man, identified as Helton, who was threatening to jump off a bridge in California.  The officer talked to Helton to figure out "what [was] causing him anguish," attempting to convince Helton to come down to safety.  Helton told the officer that he had an outstanding warrant in Colorado for "having sex with a minor."  Helton said that he had sex with a woman and her daughter at the woman's house.  The officer testified that Helton "made it sound like" Helton had sex with the

40

woman and the daughter at the same time. Helton told the officer that "it wasn't until several weeks later" that he found out that the daughter was a minor. The officer was able to convince Helton to come down.

¶ 109 The trial court admitted Helton's bridge statements, concluding that they tended to subject him to criminal liability and were supported by corroborating circumstances of trustworthiness.

¶ 110 We first conclude that Helton's statements about having had sex with a minor had a strong tendency to subject him to criminal liability. Daley argues that the statements did not satisfy every element of particular sexual offenses, but that is not the test. It is enough that the statements "would have been probative in a trial against" Helton. *Id.* at 390.

¶ 111 The court also properly exercised its discretion by finding corroborating circumstances indicated the trustworthiness of the statements. Helton made them while he was distraught, threatening to jump off a bridge. These circumstances indicate that Helton believed what he was saying — he was upset enough about what he said he had done (or that others had found out what he had done) that he was considering ending his life.

¶ 112    Thus, the trial court acted within its discretion by admitting Helton's statements on the bridge.

### b.    Helton's Jail Phone Call

¶ 113    After the bridge incident, Helton was taken to jail in California. While awaiting extradition to Colorado, he had a phone call with his wife, during which they discussed the Colorado warrant.

¶ 114    Daley stated at a pretrial motions hearing that she did not object to the prosecution introducing Helton's jailhouse statements. Daley's counsel mentioned the phone call during opening statement: "You will hear about e-mail statements and other statements he makes that we have in recorded phone calls where he is admitting to that sexual threesome." Later in the opening statement, Daley's counsel referenced specific statements that Helton made on the call.

¶ 115    On these facts, we conclude that Daley invited any error with respect to admitting Helton's jail phone call.

¶ 116    "The doctrine of invited error prevents a party from complaining on appeal of an error that he or she has invited or injected into the case; the party must abide the consequences of his or her acts." *People v. Rediger*, 2018 CO 32, ¶ 34.  The invited error

doctrine only applies to "trial strategy but not to errors that result from oversight." *Id.*

¶ 117   Daley cannot complain that statements she relied on in opening statement were later admitted into evidence. *See Gray v. People,* 139 Colo. 583, 588, 342 P.2d 627, 630 (1959) ("[W]e cannot consider the trial court to be in error for giving an instruction *demanded* by the defense."). The multiple instances when Daley could have objected to this evidence, but did not, coupled with her multiple references to the phone call during opening statement, demonstrate that she made a strategic choice to use that evidence. Daley therefore invited any error, so appellate review is barred. *Rediger,* ¶ 34.

### 3.    Res Gestae

¶ 118   Daley next argues that the court erred by admitting a myriad of evidence about her sex life as res gestae. Daley does not argue that the res gestae doctrine should be abolished. *See People v. Rojas,* 2020 COA 61, ¶¶ 19-24 (holding that evidence was admissible under the res gestae doctrine) (*cert. granted* Oct. 6,

2020).[6]  She only argues that the evidence was irrelevant and unduly prejudicial under CRE 401-403.

### a.    Additional Facts

¶ 119    The prosecution presented a multitude of evidence concerning the sexualized environment in which Daley raised the victim.  For example, when the victim was in elementary school, Daley and a boyfriend had loud sex in a bedroom while the victim was sleeping in the bedroom closet.  Daley also shared intimate details about her sex life with the victim.  The victim testified that Daley would masturbate in her presence, including times when they were sharing a bed.  The victim testified that she and Daley would walk around their house naked, and that Daley would slap or grab the victim's breast or buttocks.  The prosecution argued that all of this was evidence of "grooming" the victim, helping to explain how the victim reacted to the abuse.  The trial court admitted this evidence as res gestae.

---

[6] Based on the order granting certiorari in *People v. Rojas*, 2020 COA 61, the supreme court is considering abrogating the res gestae doctrine in Colorado.  *Rojas v. People*, (Colo. No. 20SC399, Oct. 6, 2020) (unpublished order).  Current case law, however, recognizes the res gestae doctrine.

¶ 120 Daley argues that the court erred by allowing the following testimony:

- there were occasions when the victim overheard or saw Daley and a boyfriend having sex or engaging in other sexual acts;

- Daley had vibrators, lubricant, condoms, latex gloves, and sex toys in her bedroom;

- upon her arrest at the airport, Daley had vibrators and sex toys in her luggage; and

- Daley's digital devices included a number of sexually explicit photos of Daley.

¶ 121 Additionally, she challenges the admission of a photo of Daley using a vibrator on her genitals.

b. Law

¶ 122 Res gestae is "matter incidental to the main fact and explanatory of it." *People v. Rollins*, 892 P.2d 866, 872 (Colo. 1995) (citation omitted). Res gestae is generally "linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *People v. Quintana*, 882 P.2d

1366, 1373 (Colo. 1994) (citation omitted).  But res gestae must still be relevant under CRE 401 and not unduly prejudicial under CRE 403.  *Rollins*, 892 P.2d at 873.

¶ 123　Evidence is relevant under CRE 401 when it makes the existence of a consequential fact more or less probable than it would be without the evidence.  The rules of evidence strongly favor the admission of relevant evidence.  *Murray v. Just in Case Bus. Lighthouse, LLC*, 2016 CO 47M, ¶ 19.

¶ 124　CRE 403, however, requires the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice."  "Evidence is unfairly prejudicial only if it has a tendency to suggest a verdict on an improper basis, such as bias, shock, anger, or sympathy."  *People v. Ellsworth*, 15 P.3d 1111, 1114 (Colo. App. 2000).  When admitted evidence is challenged on appeal under CRE 403, the reviewing court must afford the evidence its maximum probative weight and its minimum prejudicial effect.  *Murray*, ¶ 19.

¶ 125　"Rule 403's 'probative value' is not considered in isolation but signifies the 'marginal' or 'incremental' probative value of evidence relative to the probative force of other evidence available in the

case." *People v. Williams*, 2020 CO 78, ¶ 14 (citations omitted).
Thus, we consider the extent to which the proffered evidence "adds logical force . . . to the existing body of evidence proving the same material fact." *Id.*

### c. Application

¶ 126 We conclude that the court did not abuse its discretion by admitting this evidence.

¶ 127 The evidence was relevant. The lion's share of it supported the prosecution's theory of the case: Daley was able to get the victim to participate in sexual activities and procure her silence about what Daley was doing because of years of grooming. Evidence offered to demonstrate grooming included testimony about instances when Daley would have audible sex or masturbate in the victim's presence or while she was nearby. The victim's testimony corroborated this theory of the case. When the victim told others about the types of things her mother did to her, the victim was surprised at how upset *they* were. This evidence was relevant and highly probative. The probative value of this evidence far exceeded any unfair prejudice.

¶ 128    Next, the sexually explicit photograph of Daley tended to rebut the assertion that the naked photos she sent to the British Guy were mere "diet" photos (Daley's theory), rather than sexually explicit photos. The photo of Daley, as well as the victim's testimony about other photos, also rebutted the argument that the *victim* introduced Daley to sending sexually explicit photos on the internet. While the photo and this testimony may have been unfairly prejudicial, affording the evidence its maximum probative value and minimum prejudicial effect, we cannot say that the court abused its discretion by admitting it. *See Murray*, ¶ 19.

¶ 129    Next, testimony about Daley's possession of sexual toys and devices was relevant to the victim's allegation that Daley had taken a nude photo of her handcuffed to the bed, used vibrators on her, and purchased vibrators for her. Because this evidence corroborated some of the material allegations in the case, it was highly probative and not excludable under CRE 403.

¶ 130    The trial court therefore did not abuse its discretion by admitting any of this evidence.

¶ 131    But even if any evidence of Daley's lawful sexual activities was errantly admitted, the error was harmless. Daley argues that the

error "allowed jurors with more conventional tastes to judge her negatively." To the contrary, the evidence of the crimes for which Daley was convicted was a much more prejudicial basis for which the jury could judge her negatively. Like in *People v. Herron*, the res gestae evidence was "vastly overshadowed" by the multitude of evidence of sexual abuse of a child for which Daley was convicted. 251 P.3d 1190, 1198 (Colo. App. 2010) (evaluating the harmlessness of CRE 404(b) evidence).

¶ 132 And again, the jury's split verdict demonstrates that the evidence was not so overly prejudicial that the jury could not properly evaluate the case as a whole. The split verdict demonstrates that the jury did not hear the evidence of Daley's lawful sexual activities and decide on that basis that she was guilty of every sexual crime with which she was charged.

4.    Excluding Testimony Under the Rape Shield Statute

¶ 133 The prosecution asked one of its witnesses, "Did [the victim] tell you whether she had, in fact, found someone to take her virginity" around the time of the interactions with the British Guy? The witness responded, "Yes. They — she said that it was almost her cousin . . . at one point, and [the cousin] stopped it right before

49

they had intercourse, and then she found another guy online."  The

prosecution did not ask about the cousin or that interaction.  When

Daley indicated her intent to call the cousin as a witness and ask

him about his sexual contact with the victim, the court ruled that

the testimony was barred by the rape shield statute.  *See* § 18-3-

407(1), C.R.S. 2020.

¶ 134    "Evidence of specific instances of the victim's or a witness's

prior or subsequent sexual conduct, opinion evidence of the victim's

or a witness's sexual conduct, and reputation evidence of the

victim's or a witness's sexual conduct" is only admissible in limited

circumstances.  *Id.*  The statute reflects "the state's policy . . . that

victims of sexual assaults should not be subjected to psychological

or emotional abuse in court as the price of their cooperation in

prosecuting sex offenders."  *People v. McKenna,* 196 Colo. 367, 372,

585 P.2d 275, 278 (1978).  The statute requires the proponent of

the evidence to make an offer of proof as to the "relevancy and

materiality" of the evidence before it can be admitted.  § 18-3-

407(2).

¶ 135    On appeal, Daley argues that the prosecution opened the door

to further questioning about the cousin's sexual history with the

50

victim. She contends that the court erred in foreclosing this line of questioning. We do not address the interplay of the rape shield statute and the doctrine of opening the door because Daley's offer of proof at trial was clearly insufficient under the statute.

¶ 136 Defense counsel argued that further testimony from the cousin went to the victim's credibility. But a "defendant cannot introduce evidence of a victim's prior sexual history to attack the credibility of a victim as a witness." *People v. Wallen*, 996 P.2d 182, 186 (Colo. App. 1999) (interpreting the rape shield statute). Even if the doctrine of opening the door somehow negates that black letter rule of law, Daley has not explained how this testimony would impinge the victim's credibility. The victim testified that she lost her virginity to someone she met online with the help of her mother. The testimony of the prosecution's witness did not contradict that. Without more, it is not clear how the victim's credibility would have been impeached by the proffered evidence.

¶ 137 Daley also argues that the cousin should have been allowed to "defend himself." But what the cousin did or did not do had nothing to do with the offenses that Daley was charged with.

¶ 138    On appeal, Daley argues that the cousin's testimony was necessary to rebut the inference "that Daley was recruiting her own nephew to take her daughter's virginity to facilitate plans with [the] British [G]uy." Daley did not make this argument to the trial court in her offer of proof, so we will not consider it. Even if we did, it is not at all clear how the witness's testimony led to the inference that Daley was recruiting the cousin to have sex with the victim because the testimony did not mention Daley.

¶ 139    The court properly exercised its discretion in excluding this testimony under the rape shield statute.

### 5.    Cumulative Error

¶ 140    Last, Daley argues that cumulative error deprived her of a fair trial. We disagree.

¶ 141    The doctrine of cumulative error requires that numerous errors occurred, not merely that they were alleged. *People v. Allgier*, 2018 COA 122, ¶ 70. "For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not. Stated simply, cumulative error involves

cumulative prejudice." *Howard-Walker v. People*, 2019 CO 69, ¶ 25 (citation omitted).

¶ 142    We have only identified one error, the detective's testimony on the consistency of the victim's statements. We concluded that this error was harmless. The doctrine of cumulative error is therefore inapplicable.

### III.    Conclusion

¶ 143    The judgment of conviction is affirmed.

JUDGE RICHMAN and JUDGE WELLING concur.