23CA0628 Peo v Arredondo 08-21-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0628
City and County of Denver District Court No. 21CR6352
Honorable Adam J. Espinosa, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Roberto Arredondo,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE J. JONES
Moultrie and Graham*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 21, 2025

---

Philip J. Weiser, Attorney General, Sonia Raichur Russo, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Polansky Law Firm, PLLC, Lisa A. Polansky, Boulder, Colorado, for Defendant-
Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1       Defendant, Roberto Arredondo, appeals the district court's judgment of conviction entered on jury verdicts finding him guilty of one count of sexual assault and two counts of violation of a protective order.[1]  We affirm.

## I.       Background

¶ 2       Arredondo's wife, A.V., alleged that on September 11, 2021, Arredondo sexually assaulted her at their home.  Arredondo came into the bedroom A.V. had been using after a fight between them in August (discussed in more detail below).  They argued, and A.V. started recording on her phone.  Arredondo grabbed A.V., took the phone out of A.V.'s hand, and threw it.  A.V. told Arredondo she didn't want anything to do with him and to get out.  He responded, "You're mine and I can do whatever I want with you."

¶ 3       Arredondo "forcefully" took off A.V.'s clothes, over her repeated demands to stop.  Then he forced her down onto the bed, with her hands behind her back, and "put his penis in [her] vagina."  A.V.

---

[1] The People assert that Arredondo only challenges his sexual assault conviction.  But we read several of his appellate contentions as applying equally to his violation of a protection order convictions.

repeatedly told him to let her go. He didn't. The assault lasted between ten and twenty minutes.

¶ 4     Based on this assault, the People charged Arredondo with sexual assault (knowingly causing sexual intrusion or penetration without the victim's consent) under section 18-3-403(1)(a), C.R.S. 2024.

¶ 5     Three days after the September 11 assault, A.V. obtained a civil protection order against Arredondo prohibiting him from, among other things, coming to the home. (A.V. had filed for dissolution of the marriage on August 24, 2021.) Twice in October, Arredondo came to the home.

¶ 6     Based on those two incidents, the People charged Arredondo with two counts of violation of a protection order under section 18-6-803.5(1), C.R.S. 2024.

¶ 7     At trial, Arredondo's theory of defense was that he and A.V. had consensual sex on September 11; A.V. had fabricated the allegation that she had been sexually assaulted. Initially, according to Arredondo, A.V. accused him of sexual assault because she wanted to divorce him and had been waiting until the "time was right" to "hit him where it hurts." Accusing Arredondo of sexual

assault allowed A.V. to get a protection order — meaning she would have some breathing room to proceed with the divorce. Later, after learning that she could avoid having to wait in Mexico for her application for legal residence to be processed if Arredondo was convicted of a felony — and she was the victim — she leaned into the sexual assault allegation. As defense counsel put it, she was taking advantage of the situation to further her desire to obtain legal United States residency. But, counsel argued, A.V.'s story kept changing and she claimed not to remember things she should have been able to remember. That, coupled with her motive to accuse Arredondo, showed that she was making up the allegation of sexual assault.

¶ 8     A jury found Arredondo guilty of all three charges.

## II.    Discussion

¶ 9     Arredondo contends that the court erred by (1) admitting evidence of his behavior toward A.V. and the volatile nature of their relationship, including evidence of a previous confrontation between him, A.V., and A.V.'s adult daughters in August 2021; (2) denying his attorney's motions for a mistrial after two jurors learned of A.V.'s health scare, resulting in her going to the hospital during the

trial; (3) allowing a law enforcement officer to give expert opinions in the guise of lay testimony; and (4) allowing the prosecution's domestic violence expert to testify about irrelevant matters, bolster A.V.'s credibility, and rely on racial stereotypes.  He also contends that (5) the evidence was insufficient to support his sexual assault conviction and (6) the errors identified above constitute cumulative error requiring reversal.  We address and reject each of these contentions in turn.

### A.    "Character Assassination" Evidence

¶ 10    Arredondo contends that much of the evidence admitted at trial was irrelevant and unduly prejudicial, amounting to nothing more than "character assassination."  His arguments are somewhat diffuse, often presented in a scattershot and conclusory fashion.  All suffer from a surfeit of hyperbole.  But we have done our best to ferret out Arredondo's precise points of disagreement with the court's evidentiary rulings.

### 1.    Standard of Review

¶ 11    We review a district court's evidentiary rulings for an abuse of discretion.  *Nicholls v. People*, 2017 CO 71, ¶ 17.  A court abuses its discretion in this context when its decision is manifestly arbitrary,

unreasonable, or unfair or based on a misunderstanding or misapplication of the law.  *People v. Jones*, 2025 COA 43, ¶ 19.

¶ 12     If a challenge to a court's evidentiary ruling was preserved by timely objection, we review any error — that is, any abuse of discretion — for harmless error.  *People v. Zapata*, 2016 COA 75M, ¶ 38, *aff'd*, 2018 CO 82.  But if a challenge wasn't preserved by timely objection on the same grounds raised on appeal, we review any error for plain error.  *Hagos v. People*, 2012 CO 63, ¶ 14.

¶ 13     Some of Arredondo's evidentiary challenges were preserved.  Some weren't.  And the parties don't entirely agree as to which ones were and which ones weren't.  We address preservation as to Arredondo's challenges only where necessary.

### 2.     Failure to Apply *Spoto*

¶ 14     Arredondo first contends that the district court allowed the prosecution to introduce extensive evidence about the nature of the relationship and physical and verbal abuse through A.V. and her adult daughters without analyzing it under the four-part test for admitting evidence of other acts articulated in *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990).  The record doesn't support this contention.

¶ 15    The prosecution filed a notice of its intent to introduce evidence of other acts under CRE 404(b) and section 18-6-801.5, C.R.S. 2024, based on the contents of an interview with A.V.  The court held a hearing on the motion.  Expressly applying the *Spoto* test, the court ruled admissible evidence of an incident on A.V.'s birthday (and the following morning) during which Arredondo had taken advantage of her after she had consumed so much alcohol she wasn't aware of what he was doing.  Arredondo told her that because she was his wife, he "can do anything he wants."  But the court excluded other prior acts evidence.

¶ 16    The prosecutor argued that there was other evidence of occasions when Arredondo had sexually assaulted A.V. and had told her he could do whatever he wanted to her because she was his wife, and that this evidence was disclosed in the report of the interview.  The court then thanked the prosecutor for pointing that out and ruled that any such evidence was also admissible.  The court found expressly that the evidence satisfied the *Spoto* test.

¶ 17    The prosecutor then argued that additional evidence the prosecution wished to present — including testimony by the daughters — about the history of the relationship, threats, and

6

control was relevant to Arredondo's defense that A.V. had fabricated the allegations, as evidenced in part by her delay in reporting the September 11 sexual assault. Specifically, the evidence would explain why A.V. waited until she did to come forward. The court ruled that this evidence about the nature of the relationship and other incidents of physical and verbal abuse would be allowed.

¶ 18    As Arredondo points out, the court didn't reference *Spoto* when ruling on the admissibility of this last fund of evidence. But the context clearly indicates that the court was aware of the *Spoto* test, knew that test applied to all the evidence in question, and that this evidence was admissible for the same reasons as the other evidence of other incidents.

### 3.    The August 2021 Incident

¶ 19    A.V. learned in August 2021 that Arredondo was having an affair with her sister. She and her daughters confronted Arredondo about the affair. They argued. Heatedly. Arredondo tried to punch one of the daughters; A.V. and another daughter intervened and Arredondo threatened to punch A.V. One of the daughters recorded part of the argument, during which Arredondo threatened A.V.

¶ 20　A.V. told Arredondo to leave the house.  He did.  But he returned a few days later.  A few days after this argument, A.V. filed for dissolution of marriage.

¶ 21　Arredondo argues that the testimony about the August 2021 confrontation and the recording were inadmissible under CRE 404(b) because the evidence "had no tendency to prove an element of the offense" and had "no logical relevance independent of the impermissible inference that [he] had a bad and violent character." We don't agree.

¶ 22　CRE 404(b)(1) provides that evidence of other acts is inadmissible to show that a defendant has a bad character and acted in conformity therewith.  But such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  CRE 404(b)(2).  The General Assembly has expressly recognized that evidence of other acts may be particularly relevant in cases involving sex offenses.  As pertinent to this case, such evidence may be relevant to refute defenses such as consent or recent fabrication.  § 16-10-301(1)-(3), C.R.S. 2024.  And the General Assembly has approved the

admissibility of other acts of domestic violence in prosecutions involving domestic violence to give necessary context to the charged act and the victim's behavior.  § 18-6-801.5.

¶ 23    Whenever the prosecution seeks to admit other acts evidence extrinsic to the charged offense, it must satisfy, and the court must analyze, each prong of the four-part *Spoto* test.[2]  That test asks whether (1) the evidence relates to a material fact; (2) the evidence is logically relevant; (3) the logical relevance is independent of the inference that the defendant acted in conformity with a bad character; and (4) the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.  *Spoto*, 795 P.2d at 1318.

¶ 24    As we read Arredondo's challenge to evidence of the August 2021 altercation, he argues that it fails the second and third prongs of the *Spoto* test.

¶ 25    The evidence was logically relevant.  To the extent Arredondo asserts that it wasn't because it didn't directly prove "an element of the offense," that assertion is misguided.  The evidence need only be

---

[2] We will assume that the August 21 evidence was extrinsic to the charged offenses.

9

"somehow probative of an ultimate fact." *Yusem v. People*, 210 P.3d 458, 464 (Colo. 2009); *see Jones*, ¶ 23. The evidence was probative of the ultimate fact of whether Arredondo sexually assaulted A.V. because it tended to show Arredondo's knowledge and intent as well as to rebut Arredondo's defenses of consent and recent fabrication. *See Jones*, ¶ 26 (collecting cases); *People v. Cross*, 2023 COA 24, ¶¶ 10-15; *People v. McBride*, 228 P.3d 216, 227 (Colo. App. 2009); *People v. Fry*, 74 P.3d 360, 370-71 (Colo. App. 2002), *aff'd*, 92 P.3d 970 (Colo. 2004); § 16-10-301(3); § 18-6-801.5(3).

¶ 26 And this relevance was independent of the impermissible inference. *Spoto* "does not demand the absence of the inference"; it "merely requires that the proffered evidence be logically relevant independent of that inference." *People v. Snyder*, 874 P.2d 1076, 1080 (Colo. 1994). To be sure, the evidence cast Arredondo in a bad light. But it also shed light on Arredondo's actions on September 11 and A.V.'s lack of consent and delay in reporting the assault.

¶ 27 The district court therefore didn't abuse its discretion by admitting this evidence.

#### 4. Other Evidence of Other Acts

¶ 28 Next, Arredondo challenges the district court's admission of testimony by A.V. and her two adult daughters about his "threats; physical abuse; vile language; controlling personality; homophobia; and infidelity." He argues that none of this evidence had any relevance "independent of the impermissible inference that [he] had a bad and violent character" (*Spoto* prong 3) and that any probative value the evidence had was substantially outweighed by the danger of unfair prejudice (*Spoto* prong 4).

¶ 29 Largely for the reasons discussed in the preceding section, we reject this argument. With one possible exception, the evidence had independent relevance to the issues of Arredondo's knowledge and intent and A.V.'s alleged consent and delay in reporting.[3] And

---

[3] One of A.V.'s daughters testified that Aredondo "discriminated against [her] because of my sexual orientation because I like women. And he, in fact, threatened to send me back to Mexico because of my sexual preference for liking women." Arredondo's attorney didn't object. This testimony was arguably irrelevant to any issue in the case. But any error in allowing that testimony wasn't plain because it was an isolated remark in the midst of several days of testimony and other evidence, and the prosecution didn't rely on it. It therefore doesn't cast serious doubt on the reliability of the judgment of conviction. *Hagos v. People*, 2012 CO 63, ¶ 14.

although the evidence had some potential for unfair prejudice, ascribing to the evidence its maximum probative value and minimum unfair prejudice, *see Yusem*, 210 P.3d at 467, we conclude that it didn't have an undue tendency to suggest a verdict on an improper basis. *See Cross*, ¶ 26.[4]

### B. Denial of Motions for a Mistrial

¶ 30 Arredondo contends that the district court abused its discretion by denying his attorney's motions for a mistrial based on two jurors learning that A.V. was treated by medical personnel during the trial. We disagree.

---

[4] Arredondo contends that one of A.V.'s daughters improperly testified that he raped A.V. On cross-examination, defense counsel asked A.V.'s daughter about conversations she had with A.V. and Detective Gomez. Defense counsel asked, "And [A.V.] had told you that Roberto tried to rape her?" She answered, "Not that he tried. That he had raped her." He subsequently asked, "And during that conversation [with Detective Gomez] you told her what was relayed to you was he tried to do something inappropriate?" She responded, "Honestly, I don't remember if I said that. But like I said, he didn't try. He did it." Her responses, to which counsel didn't object, indicated that defense counsel was trying to put words into her mouth and was misrepresenting what A.V. had told her. Those responses were foreseeable and therefore any challenge to their admissibility is barred as invited error. *See People v. Wittrein*, 221 P.3d 1076, 1082 (Colo. 2009).

## 1. Additional Facts

¶ 31     During cross-examination of A.V., the court ordered a recess at the prosecutor's suggestion.  As a juror later indicated, A.V. had become upset and was "kind of leaning over kind of like maybe she was hyperventilating."

¶ 32     After the jury left the courtroom, the court said it was going to ask medical personnel to attend to A.V.  They did so, ultimately transporting her to the hospital.

¶ 33     Following the thirty-five-minute recess, defense counsel moved for a mistrial, arguing that the jury had been "tainted with sympathy . . . by what they observed."  After the prosecutor responded, the court denied the motion because it wasn't convinced that the defense had been prejudiced.  According to the court, A.V. "got upset, she appeared to by crying.  She turned her seat around, almost as if not to cry in front of the jury."  No juror had seen what subsequently happened in the courtroom.

¶ 34     When the trial recommenced, the prosecution called another witness.  (The court told the jury that the defense would continue cross-examining A.V. "at a later point.")  A.V. testified the following day, without incident.

¶ 35     During deliberations, juror A.D.G. sent a note to the court which said, "I saw who I believe was [A.V.] leave in an ambulance yesterday while we were on a break.  Is this information I can share with the other jurors[?]"  Defense counsel renewed his motion for a mistrial.  The court questioned A.D.G. on the record outside the other jurors' presence.  A.D.G. said she had shown the foreperson the question.  The court asked, "Seeing this information, does this cause you any concern about your ability to be fair and impartial to both sides in this case?"  A.D.G. answered, "No.  I wouldn't — I was a little surprised to see it, but not shocked because of what we'd seen in the courtroom."

¶ 36     In response to questioning by the prosecutor, A.D.G. said she was alone on a floor below where the trial was taking place when she saw A.V. on a stretcher leaving the building.  She didn't actually see her being loaded into an ambulance.  She assumed A.V. was "basically okay" because the court said A.V. would finish testifying the next day.  The prosecutor asked A.D.G. whether there was "[a]nything about sort of that observation of [A.V.] that would lead you not to be able to follow [the instruction that neither sympathy nor prejudice should influence her decision]?"  A.D.G.

14

said, "No." She also said "no" when the prosecutor asked her whether anything about the event "would prejudice you against the [d]efense?" A.D.G. also confirmed that although she had seen the emotion in the courtroom, she "wasn't overly concerned" about A.V.

¶ 37 Defense counsel also questioned A.D.G. A.D.G. said that no other juror had heard her discuss the question with the foreperson. And she said none of the jurors had said anything about A.V.'s show of emotion in the courtroom. When defense counsel pressed A.D.G. about her response to the court's question whether she could still be fair and impartial, A.D.G. said, "Oh, yes. I misspoke if I said I couldn't be fair and impartial."

¶ 38 The court told A.D.G. not to tell other jurors what had been discussed.

¶ 39 The court then called in the foreperson for questioning. He confirmed that he had read A.D.G.'s question. He hadn't shared it with any of the other jurors or seen what A.D.G. had seen. He also confirmed that the incident wouldn't affect his ability to be fair and impartial, saying, "I don't see it as relevant to our decision." When the prosecutor asked him whether A.D.G.'s question or anything he had seen in court would prejudice him in the case, he said, "No."

Defense counsel didn't ask the foreperson any questions. The court told the foreperson not to discuss the matter with any of the jurors.

¶ 40 The court then addressed defense counsel's renewed motion for a mistrial. The court denied it, saying it was "convinced that these jurors can be fair and impartial to both sides."

### 2. Applicable Law and Standard of Review

¶ 41 "A mistrial is the most drastic of remedies. It is only warranted where the prejudice to the accused is too substantial to be remedied by other means." *People v. Collins*, 730 P.2d 293, 303 (Colo. 1986) (citation omitted).

¶ 42 The court has broad discretion to grant or deny a mistrial motion, and we won't disturb its decision absent a showing by the defendant of a gross abuse of discretion and prejudice to the defense. *People v. Owens*, 2024 CO 10, ¶ 125; *Collins*, 730 P.2d at 303.

### 3. Analysis

¶ 43 In the somewhat analogous context of emotional outbursts by witnesses, the Colorado Supreme Court and a division of this court have affirmed trial courts' denials of mistrial motions in circumstances arguably more extreme than those in this case.

16

*Owens*, ¶¶ 130-34; *People v. Ned*, 923 P.2d 271, 276-77 (Colo. App. 1996); *cf. People v. Dominguez-Castor*, 2020 COA 1, ¶¶ 94-97 (affirming denial of motion for mistrial after a juror fainted while viewing autopsy photos of the victim). In *Ned*, a division also cited several decisions affirming the denial of mistrial motions when witnesses became distraught. *Ned*, 923 P.2d at 276.

¶ 44     In this case, the court took care to determine what jurors had seen and whether they could remain impartial. The court was entitled to take these jurors at their word that they could. *See Dominguez-Castor*, ¶ 97.

¶ 45     Arredondo's assertions of prejudice are entirely speculative. For instance, he speculates that other jurors may have seen A.V. being taken to the ambulance. Nothing in the record supports this assertion; indeed, the record created by the court undermines it. And Arredondo's conclusory assertion that what the jurors saw in the courtroom "clearly impacted them into the following day and into the courtroom" is pure conjecture. A.D.G.'s responses to questions by the court and counsel bely any such conclusion. The fact that A.V. returned to the courtroom the following day to finish testifying, and did so without incident, also reduced the possibility

of the jurors basing their decision on sympathy for the victim. *See People v. Gladney*, 570 P.2d 231, 235 (Colo. 1977) (the mere possibility of prejudice isn't sufficient to warrant reversal of the denial of a mistrial; an appellate court won't "speculat[e] . . . to find that the defendant was prejudiced"); *People v. Raehal*, 971 P.2d 256, 260 (Colo. App. 1998) ("[T]his court must give deference to the findings of the trial court, based on its observation of courtroom occurrences, rather than engage in abstract speculation to find prejudice.").

¶ 46  Arredondo argues, however, that the court should have questioned the other jurors to determine whether any of them had also seen A.V. being wheeled to the ambulance. But defense counsel didn't ask the court to do so. And when the court asked defense counsel whether he wanted the court to answer A.D.G.'s question for the jury, he said "no." Given A.D.G.'s answers, there is no indication that any of the jurors saw this event.

¶ 47  Arredondo also argues that the court should have given the jury a "curative instruction" concerning what they had seen in the courtroom. But the court offered to consider such an instruction if defense counsel would propose one. Defense counsel didn't take

18

the court up on the offer, arguably waiving this argument. In any event, the court didn't abuse its discretion by failing to give an instruction that defense counsel didn't request. *See People v. Mersman*, 148 P.3d 199, 204 (Colo. App. 2006) (where defense counsel didn't ask the court to give a curative instruction, the court didn't abuse its discretion by denying the motion for a mistrial); *see also People v. Van Meter*, 2018 COA 13, ¶¶ 10-15.

¶ 48    In sum, we conclude that the district court didn't abuse its discretion by denying defense counsel's motions for a mistrial.

### C.    Expert Testimony by Lay Witness

#### 1.    Additional Background

¶ 49    Detective Denise Gomez testified about her role in the investigation leading to the charges. At the time she was involved in the investigation, she worked in the police department's sex crimes unit. At the beginning of her testimony, the prosecutor had her describe her experience and training, including her training concerning sex crimes in the domestic violence context. She explained that the training illustrated the importance of understanding "the cycle of domestic violence" and "the mindset of the victim that you are going to be interviewing as well as the

suspect." The prosecutor asked her whether she had "training in sort [sic] of trauma and how that might affect retention or memory." She said she had. The prosecutor then asked her whether "part of your training [was] that victims of trauma can have challenges with sequencing and details and memory." Detective Gomez responded, "It's called trauma brain, yes, and, yes, there's actually a term for it." The prosecutor then asked her, "In your experience with interviewing victims of domestic violence and sexual assault, do they have challenges with recounting specific timelines and details of events?" Detective Gomez responded, "Yes."

¶ 50 The prosecutor then turned to Detective Gomez's investigation of the case, specifically her interviews of A.V. and two of A.V.'s daughters. At one point, the prosecutor asked her whether A.V. had a "sort of disconnect or some confusion" in understanding and responding to questions. She said, "Yes." When the prosecutor asked her what she attributed that to, Detective Gomez said, "Trauma brain."

¶ 51 Defense counsel didn't object to any of this testimony. Indeed, on cross-examination, defense counsel asked Detective Gomez a series of questions about how "trauma brain" can occur, how it can

20

manifest itself, and the difficulty a person who has experienced trauma may have in compartmentalizing information or remembering things.

¶ 52     On redirect, the prosecutor asked, "[A]s counsel was asking you some of these questions about trauma brain, fair to say that this is complex neuroscience?"  Detective Gomez said, "It is."  The prosecutor went on to question Detective Gomez about how trauma victims can have difficulty providing complete and accurate timelines and details of events.  Defense counsel objected to one of these questions — about the effect of "prolonged trauma" — on relevance grounds, arguing that the case was about "one incident."  The court overruled that objection.  Detective Gomez went on to testify, in response to the prosecutor's questions, how a person's brain may "shut down" when the natural "fight or flight" response kicks in.  And she explained the concept of "disassociation," where a person is "just not mentally there," and the brain "shuts down" and doesn't remember what happened.  The prosecutor prefaced some of his questions on redirect with whether Detective Gomez could answer based on her "training and experience" or, sometimes,

just her "experience."  Other than the one relevance objection noted above, defense counsel didn't object to any of this testimony.

¶ 53     The prosecutor didn't mention "trauma brain" in closing.  But defense counsel did.  Defense counsel argued that the prosecution had introduced the concept of "trauma brain" only in an attempt to explain errors in Detective Gomez's report — errors resulting from A.V. providing incorrect information in terms of timing and detail — and gaps in A.V.'s testimony.  Counsel went on to say, "I'm not an expert, but I've been doing criminal law for a long time.  I've never heard of this term."  He argued that the inconsistencies and erroneous details in A.V.'s story weren't "because of trauma brain."  Rather, they were a byproduct of her inventing a story of sexual assault.

### 2.     Analysis

¶ 54     On appeal, Arredondo contends that the court plainly erred by allowing Detective Gomez to testify about "trauma brain" and how it could have affected A.V.'s ability to accurately describe the events of September 11 because that testimony was expert testimony, and the prosecution didn't endorse Detective Gomez as an expert.

¶ 55     As to defense counsel's cross-examination questioning, of which Arredondo now complains, we conclude that any error was invited.  And as to all the testimony of which Arredondo now complains, any error was waived.

¶ 56     Arredondo concedes that this contention is entirely unpreserved.  But he asks us to review for plain error.  The People respond that any error was invited, precluding review even for plain error.  Alternatively, the People argue that any error wasn't plain.

¶ 57     We have "an independent, affirmative duty to determine whether a claim is preserved and what standard of review should apply, regardless of the positions taken by the parties." *Forgette v. People*, 2023 CO 4, ¶ 15 (quoting *People v. Tallent*, 2021 CO 68, ¶ 11).

¶ 58     The doctrine of invited error prevents a party from complaining on appeal about an error that he injected into the case.  *People v. Rediger*, 2018 CO 32, ¶ 34.  If a party invited an error, we won't review the issue at all, even for plain error.  *See People v. Gross*, 2012 CO 60M, ¶ 12.

¶ 59     Waiver is "the intentional relinquishment of a known right or privilege."  *Rediger*, ¶ 39 (emphases and citation omitted).  "A waiver

may be explicit, as, for example, when a party expressly abandons an existing right or privilege, or it may be implied, as when a party engages in conduct that manifests an intent to relinquish [the] right or privilege or acts inconsistently with its assertion." *Forgette*, ¶ 28. "Waiver extinguishes error and therefore appellate review." *People v. Roberson*, 2025 CO 30, ¶ 13; *accord Rediger*, ¶ 40.

¶ 60    By repeatedly asking Detective Gomez on cross-examination about "trauma brain," defense counsel invited any error relating to Detective Gomez's responses to those questions because those responses were directly responsive to the questions and foreseeable. *See People v. Wittrein*, 221 P.3d 1076, 1082 (Colo. 2009).[5]

¶ 61    And Arredondo's counsel waived any error with respect to these subjects.  Counsel didn't merely fail to object when Detective Gomez brought up the concept on direct; on cross-examination he

---

[5] Arredondo argues that *Wittrein* doesn't apply because, in that case, defense counsel first brought up the problematic issue — "hyper-reporting" — during cross-examination, whereas in this case, the prosecution first asked Detective Gomez about "trauma brain."  But in *Wittrein*, the prosecutor first brought up the concept of "hyper-reporting" when questioning the prosecution's expert on direct, without objection, and defense counsel questioned the expert about that concept on cross-examination.  *Wittrein*, 221 P.3d at 1081.

asked several questions of Detective Gomez about the causes and effects of "trauma brain." The record shows that defense counsel had a strategic reason for doing so. The primary line of defense was that A.V. fabricated the allegation of sexual assault, and that this was evidenced, in part, by her incomplete, changing, and factually implausible accounts of the assault. Counsel appears to have posited that the prosecution brought up the concept of "trauma brain" in a desperate attempt to explain those problems with A.V.'s story, thereby inadvertently betraying the weakness of its case.

¶ 62    Arredondo contends that this "was an oversight on the part of defense counsel, if not incompetence." But any question whether counsel's strategy amounted to ineffective assistance must be raised in a Crim. P. 35(c) proceeding. *Gross*, ¶ 11.

¶ 63    Because Arredondo's counsel invited, in part, and waived, in toto, any claim of error with respect to Detective Gomez's purported expert testimony, we won't address it on the merits.

        D.    Improper Testimony by Domestic Violence Expert

¶ 64    Arredondo contends that the district court erred by allowing the prosecution's expert witness on domestic violence — Jennifer Walker — to give testimony that wasn't helpful to the jury, didn't fit

25

the facts of the case, and bolstered A.V.'s credibility.  We don't agree.

### 1.    Additional Background

¶ 65    The prosecution called Walker to testify as a generalized expert in the dynamics of domestic violence.  (Defense counsel didn't object.)  She hadn't reviewed any materials related to the case or met A.V.  *See People v. Cooper*, 2021 CO 69, ¶ 1 n.1 (explaining "generalized expert"); *People v. Coons*, 2021 CO 70, ¶ 53 ("[T]he point of generalized expert testimony is to educate the jury about *generic* concepts and principles without regard for the specific facts of the case.").

¶ 66    Walker began her substantive testimony by explaining the "coercive pattern of power and control tactics" in domestic violence environments.  To illustrate the concept, she referred to the "power and control wheel," which describes a number of ways one person can control another in the domestic context.  (The wheel was admitted as an exhibit.)  *See Coons*, ¶¶ 34-36 (explaining and depicting the power and control wheel).

¶ 67    Walker explained that understanding these dynamics helps people understand why a victim's behavior in response to domestic

violence may seem counterintuitive. She then discussed several of the slices on the wheel — economic abuse, coercion and threats, emotional abuse, using children — in general terms. In response to the prosecutor's questions, she explained that these power and control dynamics can cause a victim to delay reporting (or not report at all) an incident of domestic violence and can make it difficult for a victim to remember things or place events in the correct sequence.

¶ 68　On appeal, Arredondo argues that particular aspects of Walker's testimony were improper.

### 2.　Standard of Review

¶ 69　"We review a trial court's admission of expert testimony for an abuse of discretion and will reverse only when that decision is manifestly erroneous." *People v. Rector*, 248 P.3d 1196, 1200 (Colo. 2011); *accord Cooper*, ¶ 44. "This is a deferential standard that reflects the superior opportunity a trial court has to assess both the competence of an expert witness and whether that witness's anticipated opinions would be helpful to the jury." *Cooper*, ¶ 44.

¶ 70　Because defense counsel didn't object to any of the testimony with which Arredondo now takes issue, if we conclude that any

testimony was admitted in error, we will reverse only if the error was plain. *People v. Relaford*, 2016 COA 99, ¶ 36.

### 3. Analysis

¶ 71 Arredondo argues first that Walker's testimony about prolonged emotional abuse wasn't helpful to the jury, *see* CRE 702, because it didn't help the jury determine whether he assaulted A.V. on September 11 or went to his home in violation of the protection order. But the testimony was relevant to explaining why A.V. delayed reporting the assault and why there may have been gaps or discrepancies in her story, and it was used for those purposes. It was therefore directly relevant to rebutting Arredondo's defense of fabrication. *See Cooper*, ¶ 47 ("Proffered expert testimony is helpful if it 'will assist the fact finder to either understand other evidence or to determine a fact in issue.'" (quoting *Lanari v. People*, 827 P.2d 495, 502 (Colo. 1992))); *accord* CRE 702; *see also Cooper*, ¶¶ 52-53 (generalized expert testimony fits a case if it has a sufficient logical connection to the factual issues to be helpful without being unduly prejudicial; "the fit need not be perfect").

¶ 72 Arredondo also contends that Walker used statistics to bolster A.V.'s credibility. But the testimony to which he cites doesn't

support his position. Walker testified that "about 70 percent of [her domestic violence crisis center] clients have never had any law enforcement contact" and "99 percent" of victims say emotional harm lasts longer than physical harm. The first statistic concerned how domestic violence victims often delay reporting violence or don't report at all, an issue that, again, went directly to refuting Arredondo's defense. And the other was used to explain the long-term emotional harm of emotional abuse which, again, helped to explain A.V.'s behavior. Walker never opined on A.V.'s credibility or the credibility of domestic violence victims generally. The fact her testimony may have given the jury information which it could use to assess A.V.'s credibility didn't render it inadmissible.

¶ 73 Next, Arredondo argues that Walker's testimony about "cultural components" wasn't helpful, was highly prejudicial, and "hinged on highly racist and damaging stereotypes of Latino men." Not so.

¶ 74 Walker testified that persons from certain cultures may be reluctant to report abuse because (1) the victim may be undocumented; (2) distrust of law enforcement is prevalent; or (3) keeping problems inside the family is typical. She didn't identify

any particular culture, nor did she mention (even implicitly) "Latino men." Her testimony was devoid of any "racist stereotype." It was helpful for the same reason as her testimony about emotional abuse — it could help the jury to understand why A.V. delayed reporting the assault.

¶ 75    We therefore conclude that the district court didn't abuse its discretion by admitting any of the challenged expert testimony.

### E.    Sufficiency of the Evidence

¶ 76    Arredondo contends that the evidence was insufficient to support his sexual assault conviction. But his contention is premised on the inadmissibility of evidence discussed above. Because we have rejected Arredondo's challenges to that evidence, his challenge to the sufficiency necessarily fails.

¶ 77    In any event, as the People point out, A.V.'s testimony about the assault itself was sufficient on its own to support the verdict. Contrary to Arredondo's implicit assertion, corroboration of A.V.'s account wasn't necessary. *See Kogan v. People*, 756 P.2d 945, 951 (Colo. 1988) (testimony of the victims, if accepted as true, provided sufficient evidence for conviction on charges of sexual assault on a child).

## F.  Cumulative Error

¶ 78  Lastly, Arredondo contends that even if the errors he asserts don't individually require reversal, they do when considered cumulatively.  We have found only one possible error — the court's admission of A.V.'s daughter's testimony about Arredondo's displeasure with her sexual orientation.  Having concluded that there weren't multiple errors, the cumulative error doctrine doesn't apply.  *Jones*, ¶ 56; *People v. Daley*, 2021 COA 85, ¶ 142.

## III.  Disposition

¶ 79  The judgment is affirmed.

JUDGE MOULTRIE and JUDGE GRAHAM concur.