23CA1936 Peo v Taylor 03-19-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1936
El Paso County District Court No. 21CR5246
Honorable Marcus Henson, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Lamar Frederick Taylor,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE MEIRINK
J. Jones and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 19, 2026

---

Philip J. Weiser, Attorney General, Majid Yazdi, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Joseph Paul Hough, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Lamar Frederick Taylor, appeals the trial court's judgment of conviction entered after a jury found him guilty of two counts of first degree murder (intentional murder after deliberation) and one count of attempted extreme indifference first degree murder. We affirm.

## I.    Background

¶ 2    Taylor owned Union Cuisine, a restaurant that leased the kitchen at an Elks lodge. Union Cuisine would use the space until 9 p.m., and the Elks (Club) would use it after that time. Within the first year of a two-year lease, the relationship between Taylor and the Club soured. Taylor testified at trial that the Club made new rules and added provisions to the contract between the two parties. Taylor also had issues with the bathrooms flooding, his equipment breaking, a stockpot missing, and employees quitting. Taylor testified that he would only work during the daytime and carried a weapon because of the lodge's location.

¶ 3    Per the terms of the lease, Taylor had permission to hang a sign outside the lodge advertising Union Cuisine, but when he arrived at the lodge on September 9, 2021, he noticed the sign had been taken down. Taylor was there that day to prepare for a large

1

event and to meet with two Club members, James Love and Kevin Patterson, to discuss concerns that Taylor was having with two disgruntled employees. Taylor brought his fiancee with him.

¶ 4 When Taylor and his fiancee arrived, they found that the lodge's doors were locked, the shades were drawn, and the building was empty, which Taylor thought was strange because there were usually employees at the lodge at that time. Taylor unlocked the front door, entered the lodge, and saw one of the bartenders, Karen Williams. After a while, Love, the Club's "exalted ruler," walked into the lodge; Taylor asked him if he had taken down the sign. Love admitted that he had removed the sign. In response Taylor said, "[H]ey, man, you can't take the sign down. I got paperwork."

¶ 5 Shortly thereafter, Taylor attended his meeting. At that time, Taylor, his fiancee, Williams, Love, and Patterson were the only people in the building. Taylor, Patterson, and Love then went into the center dining room. Taylor testified that Patterson told him they were "shutting [him] down." Taylor responded that they couldn't do that because of the two-year contract, to which Patterson replied that the "exalted ruler overrides all of this." Taylor replied, "[L]et's just go to court." Taylor testified that Love

got upset and said, "I'll take your life like I took your business, and I know you don't want nothing to happen to that pretty little bitch of yours." Taylor testified that at this point in the interaction, he glanced back and saw Williams with a bottle in her hand positioned as if she was going to hit his fiancee in the head with it.

¶ 6 Taylor testified that Love made the following threats to his family, including his sons and daughter:

- "I know you don't want a situation where your son gets in another fender bender, but this time it won't be a fender bender."

- "I know you don't want another overdose to happen at your house. This time it will be [Taylor's daughter]."

- "Didn't [Taylor's son] just move to Louisiana?"

¶ 7 Taylor testified that he then said, "[S]o this is what we're doing now, threatening my family?" Taylor testified that Love responded, "Oh, he thinks we're playing with him. Get him." Taylor then flipped over the table the men were sitting at and reportedly blacked out. Taylor initially testified that Patterson stood up and was moving toward him, but after viewing the surveillance footage while testifying at trial, he said that Patterson was not. When reviewing

3

the video on the stand with the prosecutor, Taylor said that Love was pointing and that Patterson was looking down at his phone before Taylor flipped the table.

¶ 8      Taylor then shot Love and Patterson. After shooting the two men, Taylor left through the kitchen, walked to his car, unlocked the trunk, and removed a shotgun with a loaded magazine. Taylor's fiancee left the building with Taylor but drove away in her own car. Williams ran out of the building.

¶ 9      Jesus Manual De Santiago Martinez[1] was working construction near the lodge when he encountered Taylor. De Santiago Martinez had stopped working to find a bathroom and walked toward the lodge. De Santiago Martinez saw Taylor, who was approximately ten yards away, walking toward him and made eye contact with Taylor. Taylor then fired toward De Santiago Martinez. Taylor shot the lodge's sign twice. De Santiago Martinez testified that the sign was behind him but that he was not hit by the shots. De Santiago Martinez ran toward the construction site

---

[1] De Santiago Martinez's name is spelled and referred to inconsistently in the record. We use the spelling from the complaint and refer to De Santiago Martinez in the manner he was addressed during trial.

4

where he was originally working and said that he and his coworker ran behind a tractor. Taylor shot at the windows and door of the building and then drove away.

¶ 10 Police officers responded to a call reporting shots fired at the lodge with two potential victims inside the building. When officers arrived, they noticed the glass door was shattered. After entering the building, responding officers found Love and Patterson lying on the floor. Both men had gunshot wounds and were still breathing but unconscious. The first officers on scene attempted to render aid. Love and Patterson were taken to the hospital, where both died two days later from the gunshot wounds. No weapon was recovered at the scene, and no weapon was found near the victims.

¶ 11 Police apprehended Taylor in Miami, Florida, on September 17. Police recovered a handgun, a shotgun, and shotgun shells in the trunk of Taylor's car. The handgun recovered from Taylor's car was not the same caliber as the one that was used to kill Patterson and Love; that weapon was never recovered.

¶ 12 Taylor was charged with two counts of first degree murder under section 18-3-102(1)(a), C.R.S. 2025; four counts of criminal attempt to commit first degree murder under sections 18-3-

102(1)(a) and 18-2-101, C.R.S. 2025; and three counts of menacing under section 18-3-206(1)(a), (b), C.R.S. 2021.

¶ 13    Taylor was convicted of one count of first degree murder after deliberation for Love, one count of first degree murder after deliberation for Patterson, and one count of attempted first degree murder (extreme indifference) of De Santiago Martinez. The court sentenced Taylor to two consecutive life sentences without parole in the custody of the Department of Corrections for the murder convictions and twenty years for the attempted murder conviction, to run consecutively to the other sentences.

## II.    Analysis

¶ 14    Taylor contends that (1) the trial court erred by excluding evidence of his prior experience of witnessing and being a victim of violence because it informed his subjective mental state and use of force; (2) the court erroneously excluded evidence of Patterson's conviction for sexual assault on a child; (3) the court improperly provided a flight instruction to the jury; and (4) the errors cumulatively require reversal. We address and reject each contention in turn.

### A. Taylor's Past Experience with Violence

¶ 15    Taylor asserts that the trial court violated CRE 401 and his constitutional right to present a defense by excluding testimony that he witnessed domestic abuse against his mother and was the victim of domestic violence. Specifically, Taylor argues that his past childhood "experiences of being exposed to threats and violence by adult men" were relevant because these experiences informed his subjective mental state during his encounter with Love and Patterson and his belief that the use of force was reasonable. Taylor argues that his theory of defense was plausible and that the excluded evidence would have made the subjective reasonable belief component of his self-defense theory more persuasive. We disagree.

### 1. Additional Facts

¶ 16    At trial, defense counsel asked Taylor if he had ever been in a situation where he or someone he cared about was attacked. Taylor said "absolutely," and defense counsel asked if it was something he had experienced more than once. The prosecutor objected based on relevance, and defense counsel argued that it concerned the totality of the circumstances and Taylor's state of mind. The court sustained the objection.

¶ 17    The next day of trial, defense counsel asked the court to

reconsider, arguing that evidence about Taylor's past life experience

was admissible to prove the subjective aspect of self-defense.

Defense counsel had the following exchange with the court:

> Defense counsel: At the time of the incident,
> . . . Taylor indicated that specific experiences
> that he had had as a child essentially
> reminded him of those moments in the sense
> of what the atmosphere was, what the
> environment was, and what led to the attack,
> and how he felt similar in this situation with
> similar environment, and that's kind of what
> brought him back to that situation, knowing
> what it was like in that time, and bringing that
> present to what it was like on September the
> 9th.
>
> Court: Some sort of childhood experience in a
> darkened building?  What are we talking
> about, Counsel?
>
> . . . .
>
> Defense counsel: So in speaking with him, the
> circumstances that he was specifically pointing
> to was as he was growing up, his mother
> suffered severe abuse from other men, and he
> was around for the tactics, predatorial tactics
> that they would use against her, and the
> environment that that built up being similar to
> the predatorial tactics that were used by . . .
> Love and . . . Patterson against . . . Taylor.
> And in doing so, it brought him back to that
> memory, which brough him back, in the time
> of September the 9th, to feel the environment

8

of being in a position where he could be attacked and have to save himself or his family's lives.

¶ 18 The court again sustained the prosecutor's objection, concluding that there was insufficient relevance to get into "what sound[ed] like a very remote set of circumstances involving a family member's experiences." The court clarified that it would permit defense counsel's questions elucidating "the types of feelings . . . Taylor was having, and how that maybe . . . inform[ed] his choices," but it found Taylor's mother's experiences were

> insufficiently relevant . . . to the point where . . . relevance would be certainly outweighed by the confusion potentially that the jury might experience as far as trying to figure out what that tells us, again, about these unique circumstances and . . . Taylor's response to those circumstances.

Thus, the court allowed "additional questioning about what . . . Taylor was feeling, how he was experiencing . . . the circumstances that he was in" but not questions "going down a road of domestic violence involving his mother and things like that."

### 2. Standard of Review and Applicable Law

¶ 19 We review de novo the trial court's interpretation of law governing the admissibility of evidence. *People v. Johnson*, 2021 CO

9

35, ¶ 15. Trial courts have "considerable discretion in deciding questions concerning the admissibility of evidence and . . . broad discretion to determine the relevancy of evidence, its probative value and its prejudicial impact." *People v. Ibarra*, 849 P.2d 33, 38 (Colo. 1993). We therefore review evidentiary rulings for an abuse of discretion. *Id.* "A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misinterprets or misapplies the law." *People v. Strickler*, 2022 COA 1, ¶ 21.

¶ 20    A defendant in a criminal proceeding has the constitutional right to present a complete defense. *People v. McCoy*, 944 P.2d 584, 587 (Colo. App. 1996). This includes a reasonable opportunity to present evidence that may tend to create doubt on the defendant's guilt. *People v. Elmarr*, 2015 CO 53, ¶ 26. However, this right is not absolute and is subject to the limits on the admissibility of evidence. *Id.* at ¶ 27; *People v. Salazar*, 2012 CO 20, ¶ 17. Evidence must be relevant to be admissible, CRE 402, and evidence is relevant where it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence,"

10

CRE 401. But even relevant evidence may be excluded if its probative value "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." CRE 403. These considerations "affect even a criminal defendant's constitutional right to present a defense." *Salazar,* ¶ 17.

¶ 21　　If a trial court "erroneously rules on an evidentiary matter and thereby causes the defendant to refrain from presenting a defense, the ruling can cast 'an impermissible chill on the defendant's freedom of decision.'" *People v. Gonzales-Quevedo,* 203 P.3d 609, 611-12 (Colo. App. 2008) (quoting *People v. Kreiter,* 782 P.2d 803, 805 (Colo. App. 1988)). "A defendant's right to present a defense is violated only where the defendant was denied virtually his only means of effectively testing significant prosecution evidence." *People v. Conyac,* 2014 COA 8M, ¶ 93.

¶ 22　　Preserved errors of constitutional dimension are reviewed for constitutional harmless error. *Hagos v. People,* 2012 CO 63, ¶ 11. Under this standard, if we conclude that the error violated the defendant's right to present a defense, "we must reverse unless we are confident beyond a reasonable doubt that the error did not contribute to the guilty verdict." *Conyac,* ¶ 94. Preserved errors

that are not of a constitutional dimension are reviewed for harmless error. *Hagos*, ¶ 12. Under that standard, we only reverse if "the error substantially influenced the verdict or affected the fairness of the trial proceedings." *Conyac*, ¶ 94.

¶ 23 Section 18-1-704(2), C.R.S. 2025, provides that "[d]eadly physical force may be used only if a person reasonably believes a lesser degree of force is inadequate" and, as relevant here, "[t]he actor has reasonable ground to believe, and does believe, that he or another person is in imminent danger of being killed or of receiving great bodily injury." The statute addresses both subjective and objective aspects of self-defense. *See People v. Luna*, 2020 COA 123M, ¶ 26 ("Although the affirmative defense of self-defense takes into account the actual belief or state of mind of a defendant, it ultimately requires that a reasonable person would have believed and acted as the defendant did."); *People v. Willner*, 879 P.2d 19, 22 (Colo. 1994) ("Section 18-1-704 takes into account the reasonable belief and actual belief of an individual who has exercised physical force in self defense.").

12

### 3. Analysis

¶ 24 The court didn't abuse its discretion by excluding testimony of Taylor's experience witnessing domestic violence against his mother for several reasons. First, Taylor sought to introduce evidence related to violence perpetrated against his mother, not himself. These circumstances, describing his impressions of abuse against his mother and "predatory tactics," weren't relevant to his claim that he acted reasonably against any alleged threats posed by Love or Patterson. Simply put, Taylor's testimony that he witnessed domestic violence against his mother wouldn't have made his claim of self-defense more or less probable because the past violence that he witnessed wasn't perpetrated against him, and it didn't involve a situation similar to one resulting in his use of force — an escalated verbal altercation between business associates.

¶ 25 Second, the trial court correctly recognized that any marginal relevance the evidence did have was outweighed by the potential of juror confusion because the jury wouldn't know how to treat evidence of Taylor's mother's experience in the context of Taylor's case.

¶ 26 Third, the court didn't prohibit Taylor from discussing how his experience made him feel or informed his choices during the altercation; it just prevented him from discussing the specifics of domestic abuse his mother experienced. Indeed, Taylor was able to testify that he feared Patterson because he had "seen this before, because [his] mother was preyed on by a predator." Likewise, prior to the court's ruling, Taylor testified that he had experienced situations where he or someone he cares about had been attacked.

¶ 27 Thus, contrary to his argument, Taylor was not "denied virtually his only means of effectively testing" the prosecution's evidence. *Conyac*, ¶ 93. He was permitted to and did testify how his experience impacted his mental state. Because we hold that the court didn't err by excluding the evidence and because Taylor was permitted to testify about how his experience informed his mental state, the court's exclusion of evidence regarding Taylor's witnessing violence during his childhood didn't violate his right to present a defense.

### B. Patterson's Past Criminal Activity

¶ 28 Taylor contends that the trial court erred by excluding evidence of Taylor's knowledge and revelation of Patterson's

14

conviction for sexual assault on a child. Taylor argues that this evidence was relevant because it related to Taylor's subjective and reasonable belief that the use of force against him was imminent and that his own use of force was reasonable.

### 1. Additional Facts

¶ 29 Before trial, Taylor's counsel filed a motion in limine asking the court to permit the defense to introduce evidence of Patterson's prior criminal convictions, Taylor's awareness of the convictions, and the impact that Patterson's prior criminal history had on Taylor the day of the shooting. Taylor's counsel sought to introduce Patterson's convictions for attempted assault, misdemeanor assault, and sexual assault on a child. The motion asserted that Patterson's history of violence amplified the threats Patterson and Love had made during the encounter and caused Taylor to fear for his life and the lives of his loved ones. With respect to Patterson's conviction of sexual assault on a child, Taylor's counsel sought to introduce testimony that Taylor confronted Patterson about how that specific conviction made Patterson ineligible for Club membership and that this confrontation led to Patterson verbally

15

threatening Taylor with deadly force, which necessitated Taylor's reasonable use of force.

¶ 30 The court permitted testimony on "the purported attempted second-degree assault and the purported class 1 misdemeanor assault." It also permitted testimony involving a "confrontation [on] criminal history that might result in somebody not being eligible for club membership and . . . the response that was given." But the court prohibited the parties from discussing sexual assault on a child because it did "not believe that the evidence regarding some sexual assault on a child conviction is appropriately relevant or admissible." Specifically, the court noted that it didn't find such evidence "sufficiently relevant as it relates to a reasonable belief of imminent injury in connection with these prior purported acts." And it was "not sufficiently relevant for it to outweigh the prejudicial effect otherwise that I find that that type of reference would have in this context."

¶ 31 Defense counsel countered that because he was deceased, Patterson wasn't "susceptible to prejudice" but that Taylor was "prejudiced by being precluded from providing the full context of the situation so that the jury c[ould] decide how violent [Patterson's]

16

response was."  The court clarified that it was not doing some sort of "balancing test solely based on relevant versus prejudicial effect" of the evidence.  Rather, the court said that it was referencing prejudicial effect to establish the primary way the evidence would be viewed and that, "because of [its] diminished relevance," the evidence would "have very little potential relevance to [Taylor's] reasonable belief of imminent unlawful physical force being used by . . . Patterson."  The court clarified that it would permit "Taylor to testify about what his reasonable belief was in the context of the response, but not so much in the context of what may have prompted those initial statements or that initial . . . threat being made by . . . Patterson."

¶ 32    Taylor then testified that when he first learned about Patterson's criminal history, it scared him.  He also testified that "the predatorial tactics and actions . . . fit[] the narrative" and that he was scared "because I've seen this before, because my mother was preyed on by a predator."  Defense counsel asked Taylor if he ever mentioned Patterson's criminal history to Patterson, to which Taylor responded, "I was scared to."  Defense counsel further asked Taylor what he did with the information of Patterson's convictions,

and Taylor said he spoke to another Club member and "wanted to expose the whole situation and remove and try to at least just get rid of the bad apples and continue to move forward." When recounting what occurred during the meeting before the shooting, Taylor didn't testify that he confronted Patterson about the prior convictions.

### 2. Standard of Review and Applicable Law

¶ 33 As stated above, we review de novo the court's interpretation of law governing the admissibility of evidence, *Johnson*, ¶ 15, and its evidentiary rulings for abuse of discretion, *Ibarra*, 849 P.2d at 38. A defendant's constitutional right to present a defense is not absolute and is subject to limitations on the admissibility of evidence. *Elmarr*, ¶ 27; *Salazar*, ¶ 17.

¶ 34 A defendant is entitled to present evidence of a victim's prior violent act if (1) the defendant contends that he acted in self-defense and there is competent evidence to support the contention; (2) either the act occurred or the defendant became aware of its occurrence within a reasonable time of the homicide; and (3) the defendant knew of the victim's prior violence at the time of the homicide. *People v. Ferrell*, 613 P.2d 324, 326 (Colo. 1980).

18

"Without a nexus between the deceased's prior violent acts and the actions of the defendant, the occurrence of these prior violent acts would be of no consequence in the determination of the guilt or innocence of the defendant." *People v. Lyle*, 613 P.2d 896, 898 (Colo. 1980). Where a defendant knew of the victim's acts of violence at the time of the events, they are admissible as evidence of "the reasonableness of the defendant's belief in the imminent use of unlawful physical force against him." *People v. Jones*, 675 P.2d 9, 17 (Colo. 1984). But as mentioned above, relevant evidence may be excluded if the probative value of the evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading jury." CRE 403.

### 3. Analysis

¶ 35 Taylor argues that evidence of Patterson's prior conviction for sexual assault on a child was relevant because it related to Taylor's subjective and reasonable belief that the use of force was imminent and his own use of force was reasonable. However, the trial court ruled — and we agree — that the evidence of sexual assault on a child wasn't relevant to the reasonable belief of imminent injury. Patterson's history of sexual assault did not make it more likely

19

that Taylor acted reasonably, or believed that he acted reasonably, as the circumstances of a sexual assault on a child are factually distinct from the encounter Taylor had with Love and Patterson. And the court permitted testimony on Patterson's convictions for assault and attempted assault.  Moreover, the trial court determined that the introduction of Patterson's conviction of sexual assault on a child was not sufficiently relevant to outweigh the prejudicial effect that information would have.  *See Merritt v. People*, 842 P.2d 162, 170 (Colo. 1992) (Erickson, J., dissenting) ("It is the function of the trial judge to channel the admission of evidence in a criminal case so as to prevent prejudice to both the prosecution and the defense.").

¶ 36      Taylor also argues that the evidence was relevant to show why Patterson and Love threatened him and became enraged and violent prior to the shooting, prompting Taylor to believe it was reasonable and necessary to defend himself.  We are unpersuaded.  The court permitted Taylor to testify that he confronted Patterson about his criminal history and how that history made him ineligible for Club membership; it just prohibited Taylor from specifying that the

ineligibility was based on Patterson's conviction for sexual assault on a child.

¶ 37　Lastly, Taylor argues that the court's exclusion of evidence of Patterson's criminal history violated his constitutional right to introduce evidence in support of his defense.  We disagree.  As mentioned, Taylor was permitted to introduce evidence of Patterson's criminal history.  Thus, his constitutional right to present a complete defense was not violated.

## C.　Flight Instruction

¶ 38　Taylor contends that the trial court erred by providing a flight instruction to the jury because there was insufficient evidence that he was fleeing or intending to evade law enforcement and because flight instructions are disfavored.

### 1.　Additional Facts

¶ 39　After leaving the lodge on September 9, Taylor drove straight to New Iberia, Louisiana, where his sons lived and where he stayed until September 12.  On September 13, Taylor drove to Atlanta, where he stayed at a place he shared with his fiancee until September 15.  Taylor then arrived in Miami on September 16 and

21

stayed there until United States Marshals contacted him at his brother's house on September 17.

¶ 40    During the jury instruction conference, defense counsel objected to the proposed flight instruction, arguing that the instruction was prejudicial and that there was no evidence that Taylor's intent was to flee rather than to warn his family.  Defense counsel was also concerned that the instruction could be "misconstrued in regards to premeditation and deliberation" and could confuse the jury.  Defense counsel proposed an instruction that there was "no obligation" to remain at the scene.

¶ 41    The court noted that there had been ample discussion during jury selection and presentation of evidence "for it to be clear that what . . . Taylor did after the events is absolutely relevant to maybe the jury's understanding not only of what . . . Taylor may have been experiencing at the time of the incident, but also relevant to their understanding . . . of what . . . Taylor was thinking after the incident."

¶ 42    After reviewing the cases cited by the parties and making a few modifications, including replacing "fled" with "left the scene" and "flight" with "conduct," the court instructed the jury as follows:

> If you find from the evidence, beyond a reasonable doubt, that the crime charged in the information was committed by some person, and that immediately after such crime was committed the defendant left the scene, such conduct would be a circumstance, not sufficient in itself to establish the guilt of the defendant, but a circumstance which you may consider, in connection with all the other facts and circumstances proven at the trial, in determining the question of the guilt or innocence of the defendant. It is for you to determine from the evidence whether such conduct was caused by a consciousness of guilt or by some other innocent motive.

This instruction was immediately followed by the instruction requested by defense counsel — that "[t]here is no affirmative obligation to remain at a scene or report an act of self-defense to law enforcement."

### 2. Standard of Review and Applicable Law

¶ 43    We review de novo whether sufficient evidence exists to support giving a requested jury instruction. *People v. Stone*, 2020 COA 23, ¶ 55. We review the trial court's decision whether to give a proposed jury instruction for an abuse of discretion. *People v. Trujillo*, 2018 COA 12, ¶ 11. The trial court has broad discretion in formulating jury instructions as long as they are correct statements of the law. *People v. Garcia*, 169 P.3d 223, 230 (Colo. App. 2007).

23

¶ 44    Providing a flight instruction is generally disfavored because it puts undue emphasis on only one piece of the evidence. *People v. Sanchez*, 253 P.3d 1260, 1264 (Colo. App. 2010). Whether a flight instruction is proper depends on the facts of a particular case. *People v. Fletcher*, 566 P.2d 345, 348 (Colo. 1977). But it is not reversible error for a court to provide a flight instruction where "(1) the defendant had reason to believe he committed a crime; (2) he had reason to believe his identity was known; (3) he had reason to believe his pursuit and apprehension were likely; and (4) he fled or concealed himself to frustrate his apprehension." *Sanchez*, 253 P.3d at 1264-65.

### 3.    Analysis

¶ 45    Taylor argues that while he may have believed that he committed crimes, the People failed to demonstrate that he was aware that police had identified him or were pursuing him or that he fled to frustrate apprehension. We aren't persuaded.

¶ 46    First, Taylor testified that he "went to Miami because I needed an unbiased ear to hear my side of the story." This testimony indicates that he knew people could believe that he had committed some crime and wanted someone to hear his perspective. Taylor

also testified that he intended to contact a private investigator he knew in Miami who was familiar with the problems between the Club and Union Cuisine and was helping Taylor prepare a lawsuit to file against the Club. But instead of meeting him in person, Taylor could have called or contacted the investigator, which Taylor had done before, including to obtain Patterson's criminal history.

¶ 47 Second, Taylor had reason to believe his identity was known because several witnesses who knew him were present at the lodge during the shooting. For instance, Taylor testified that he saw Williams at multiple points before and during the meeting, and Taylor's fiancee walked out of the building with him after the shooting. Also, Taylor made eye contact with De Santiago Martinez outside of the lodge prior to firing the shotgun at the sign.

¶ 48 Third, Taylor had reason to believe that his pursuit and apprehension were likely. While the prosecution didn't present direct evidence to support this, the evidence presented about Taylor's actions after the shooting indicates that he was aware he was being pursued and that apprehension was likely. Following the shooting, Taylor rejected all incoming calls, didn't return home before leaving Colorado, didn't check on his children in Colorado

(even though they had also been threatened), didn't call any of his children, and immediately drove to Louisiana. Also, it was likely that police would watch the surveillance video and would pursue and apprehend him.

¶ 49 Finally, there was sufficient evidence to support that Taylor fled to conceal himself or frustrate his apprehension. Although Taylor said that he drove to Louisiana to check on his children, that doesn't explain why he stayed in Atlanta (alone) for two days or why he drove to Florida. Taylor's movement between multiple locations shows an intent to conceal or frustrate apprehension.

¶ 50 Accordingly, sufficient evidence was presented to support a flight instruction, and the court didn't abuse it discretion by providing the instruction.

### D. Cumulative Error

¶ 51 Taylor contends that, cumulatively, the errors deprived him of his right to a fair trial and require reversal. We reverse for cumulative error where multiple errors collectively prejudice the defendant's substantial rights. *Howard-Walker v. People*, 2019 CO 69, ¶ 25. Therefore, for cumulative error to apply, the court must have erred multiple times. *People v. Daley*, 2021 COA 85, ¶ 141.

26

Because we don't identify any errors, we need not engage in a cumulative error analysis.

## III.   Disposition

¶ 52    The judgment is affirmed.

JUDGE J. JONES and JUDGE LUM concur.